**STATE of Iowa, Appellee,**

v.

**Jack Leroy LOSEE, Jr., Appellant.**

No. 83–623.

Supreme Court of Iowa.

Aug. 22, 1984.

Charles L. Harrington, Appellate Defender, and Raymond E. Rogers, Asst. Appellate Defender, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Marcia Mason, Asst. Atty. Gen., and James Smith, Asst. County Atty., for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, LARSON and SCHULTZ, JJ.

SCHULTZ, Justice.

Defendant, Jack Leroy Losee, Jr., appeals from his conviction and sentence on two counts of first degree murder in violation of Iowa Code sections 707.1–.2. Defendant contends: (1) the trial court infringed his constitutional right of confrontation by refusing to allow defendant to impeach the State's primary witness with evidence of the results of a polygraph examination; (2) the trial court erred by requiring the jury to determine whether the prosecution's star witness was an accomplice rather than deciding the issue as a matter of law; and (3) he received ineffective assistance of counsel. We do not agree with defendant's contentions and affirm the trial court.

Defendant was convicted of killing Edwin Rains and Betty Thompson, both residents of Des Moines. Rains and Thompson shared an apartment with another woman who apparently moved out on the evening before the murders occurred. These three individuals worked for a local janitorial service. Defendant also was employed briefly by this firm; Rains was his immediate supervisor.

The execution-style murders allegedly occurred in the early morning hours of March 30, 1982. Thompson's body was discovered at 4:15 a.m. on March 30 in the middle of a road in southeast Des Moines. She died from a single gunshot wound to the head. Rains' body was not discovered ·until his car was recovered from the Des Moines river on July 26, 1982. He too died from gunshot wounds to the head and back.

Little physical evidence connected defendant to the crimes. Although both victims were shot with .38 caliber bullets and the markings on each bullet were similar, the ballistics expert was unable to determine whether the bullets had been fired from the same gun. Additionally, the murder weapon was never recovered, and two guns owned by defendant definitely were excluded as the instrument of death. A set of tire tracks at the scene of Thompson's murder did not match the tire tracks of the car defendant allegedly was driving on the night of Thompson's death, and the wheel base of the tracks did not match the wheel base of defendant's car. Contra, no direct evidence indicated that these tire tracks originated before or after Thompson's

death or were in any way associated with it.

Defendant's connection to the murders rested on the testimony of three witnesses who were granted immunity from prosecution for testifying. Two witnesses, Jack Whitney and Dawn Fetters, testified against defendant for the dismissal of unrelated charges. Both testified that defendant told them he had killed Rains and Thompson. The State's star witness was a fifteen-year-old boy, Billy Rickabaugh, who claimed to have been present at both murders. Billy testified he was present when Losee shot Rains and pushed his car in the Des Moines River. He was also present when Losee returned to the victims' apartment, escorted Betty Thompson into his car, and subsequently shot her on a lonely road in southeast Des Moines.

The only evidence defendant could produce refuting Rickabaugh's version was the testimony of the taxi driver who allegedly picked up defendant and the boy in downtown Des Moines where they had walked after dumping Rains' car in the river and drove them back to the area of the victims' apartment. The taxi driver admitted picking up two individuals on the morning of the murder, but claimed he did not recognize one of them as the defendant, whom he had known for several years. Conversely, he acknowledged that he was not certain the individual in the backseat of his cab had not been defendant.

*I. Right to confront witnesses.* Defendant urges that the trial court committed error when it refused to permit defendant to impeach a State's witness by presenting evidence that the State had administered a polygraph test to the witness. During the trial defense counsel informed the court out of the presence of the jury that he intended to call Michael Leeper, a police polygraph operator, to testify concerning the results of a polygraph test given to the fifteen-year-old witness, Billy Rickabaugh. Defendant's counsel made an offer of proof which indicated Leeper would testify that Rickabaugh's test results were inconclusive: the witness gave

the same answer to certain repeated questions, but his reactions, as measured by the machine, were different. Over the State's objection the court allowed defendant to present the examiner as a witness, but prohibited mention of the polygraph test. The examiner testified that Rickabaugh attributed his difficulty in giving a complete statement to his drinking, smoking "pot" and using "acid." He further testified that Rickabaugh expressed uncertainty on some details and recalled Betty Thompson's death like a picture in his mind—having heard, but not seen, the shooting.

■ The fourteenth amendment to the United States Constitution makes the confrontation clause of the sixth amendment applicable to the states. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 928 (1965). Consequently, in a criminal case a state court defendant has a right to confront witnesses who testify against him with evidence that discredits their testimony. Espousing confrontation rights, Losee claims that the State chose to give its own witness a polygraph test, that witness did not pass the test, and the State nevertheless presented the witness to the jury. He maintains that fundamental fairness requires that the results of the test be placed before the jury.

■ Defendant urges this court to apply the ruling found in *United States v. Hart,* 344 F.Supp. 522 (E.D.N.Y.1971). The *Hart* court allowed the defendant to present evidence to show that the government's key witness had failed a polygraph test reasoning that the State must disclose all material exculpatory evidence to the defense and may not knowingly present false evidence. *Id.* at 523–24. We do not agree that Rickabaugh failed the polygraph test; the evidence shows that it was inconclusive. Not only is *Hart* distinguishable on its facts, but we also agree with another court that the decision concerning the admissibility of the polygraph test is "unpersuasive." *United States v. Earley,* 505 F.Supp. 117, 119–20 (S.D.Iowa 1981) (citing *United States v. Alexander,* 526 F.2d 161 (8th Cir. 1975)), *aff'd,* 657 F.2d 195 (8th Cir.1981).

We also do not agree that fundamental fairness requires the admission of the witness' contradictory reactions to the polygraph test. The fact that the test results tend to be exculpatory does not remove the taint that renders such evidence inadmissible. We have consistently held that the results of a polygraph test may be admitted into evidence only by stipulation of the parties. *State v. Marti,* 290 N.W.2d 570, 586 (Iowa 1980); *State v. Conner,* 241 N.W.2d 447, 457 (Iowa 1976); *see also Matter of Fairbanks,* 287 N.W.2d 579, 582 (Iowa 1980). These holdings are premised on the ground that "[i]t has not been demonstrated that this field has been subjected to the standards, policing and discipline which are necessary in a science involving such pretentious and awesome subject matter." *Conner,* 241 N.W.2d at 459. A defendant's due process right to present evidence in a criminal action does not prevent the court from following evidentiary rules that are designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *Id.* at 458 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297, 313 (1973)). We have indicated in *Conner* that "[t]o sustain defendant's constitutional attack on the trial court's ruling excluding defendant's proffered polygraph evidence, it would be necessary for us to determine that the rule excluding unstipulated polygraph evidence does not rest on considerations of fairness and reliability." 241 N.W.2d at 458.

We continue to adhere to our rule allowing admission of polygraph evidence only by stipulation of the parties. The trial court did not err in excluding this evidence.

*II. Accomplice instruction.* In its jury instructions the trial court did not state that Rickabaugh was an accomplice as a matter of law. An instruction defined the term "accomplice" and informed the jury that the testimony of an accomplice must be corroborated pursuant to Iowa Rule of Criminal Procedure 20(3). Defendant makes no objection to the definition or the statement of law. He claims the jury should not have been allowed to determine the issue, but should have been instructed as a matter of law that Rickabaugh was an accomplice whose testimony required corroboration.

We defined accomplice in *State v. Jennings,* 195 N.W.2d 351, 356–57 (Iowa 1972):

An accomplice is a person who willfully unites in, or is in some way concerned in the commission of a crime. The general rule for determining whether a witness is an accomplice is if he could be charged with and convicted of the specific offense for which an accused is on trial.

But something more than mere knowledge that a crime is contemplated, or mere personal presence at the time and place where committed, must be shown in order to make one an accomplice. And it must be established by a preponderance of the evidence that a witness was in fact an accomplice.

(citations omitted). When the facts concerning a witness' culpability are not disputed or susceptible of different inferences, the court must decide whether the witness is an accomplice as a matter of law; when these facts are disputed or susceptible of different inferences, the jury must decide this as a question of fact. *State v. Sallis,* 238 N.W.2d 799, 802 (Iowa 1976).

Defendant claims the trial court twice indicated that Rickabaugh was an accomplice. He points to statements of the court on the record as follows: "It certainly stretches reason beyond the breaking point to suggest that Mr. Rickabaugh is absolutely not an accomplice," and "it would be a fine line to consider Mr. Rickabaugh not to be an accomplice." The State points out that the first statement was made while considering defendant's motion for directed verdict. The court further indicated that it did not have to decide the issue of whether or not Rickabaugh was an accomplice for the final determination of the motion because the testimony of Fetters and Whitney corroborated Rickabaugh's testimony. Finally, the State urges that the court did

not say in either statement that Rickabaugh definitely was an accomplice.

These statements fall short of a determination that the witness was an accomplice as a matter of law. At most, the trial judge correctly changed his mind and properly submitted the matter as an issue of fact to the jury after determining that his first impression was wrong. *State v. Martin*, 274 N.W.2d 348, 349 (Iowa 1979). At the time the matter was submitted to the jury, the trial court opined that this matter should be decided by the jury and overruled defendant's objection.

■ We hold the trial court was correct in submitting the accomplice issue to the jury for its determination. Rickabaugh's testimony indicated that he was guilty of nothing more than being an accessory after the fact. According to his version, he did not participate actively in either killing. He did not know that the killings were about to take place. Although he was a willing companion in the auto rides, he had accompanied Losee on several occasions previously. In the first killing he only helped defendant move the body into the back seat after the shooting and push the victim's car into the river. While he admitted he held the victim in the second killing, it was an attempt to calm her before defendant stopped the auto. The victim and defendant then got out of the car and walked away to the place of the murder. While there are implications that Rickabaugh was an accomplice, the jury could have accepted his version and determined to the contrary. Defendant's contention is without merit.

*III. Ineffective assistance of counsel.* Finally, defendant complains that he was deprived of his constitutional right to effective assistance of counsel. Defendant asserts that his attorneys presented inconsistent defenses—denial of involvement in the killings and diminished responsibility— whose subtleties invited confusion, incredulity and conviction. In addition, he contended that damaging testimony was elicited from the expert psychologist during cross-examination.

■ To establish his claim of ineffective assistance of counsel, defendant must show: (1) that counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment, and (2) that the deficient performance so prejudiced the defense as to deprive the defendant of a fair trial. *Strickland v. Washington*, —— U.S. ——, ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

■ Under our de novo review, counsel's performance must fall within the range of normal competency. *Sallis v. Rhoads*, 325 N.W.2d 121, 122 (Iowa 1982). It is incumbent upon the defendant to establish a factual basis to demonstrate counsel's inadequate representation. *Id.* We ordinarily do not find an adequate basis for relief when the claim of ineffectiveness concerns an attorney's decision regarding strategy or tactics. *State v. Wilkens*, 346 N.W.2d 16, 18 (Iowa 1984). When counsel makes a reasonable decision concerning strategy, we will not interfere simply because the chosen strategy is unsuccessful. *Id.* In summary, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, —— U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93.

A clinical psychologist who examined defendant in 1978 was called as a defense witness. He testified that in 1978 defendant was suffering from a personality disorder and that superimposed on top of the personality disorder was the probability of having intermittent, recurrent disassociative states. The psychologist explained that an individual who was in a disassociative state when he committed an offense either would not remember the event or would have a grossly distorted recollection, yet his behavior would appear fairly normal to the casual onlooker. He then opined on direct examination that there was a possibility defendant could have been in

such a state in 1982. Defendant's counsel successfully obtained a jury instruction on "diminished capacity." Defendant later took the stand in his own defense and denied that he committed the killings. In final argument, defense counsel argued to the jury that defendant did not commit the killings, but assuming he did, he was suffering from a diminished capacity. Defendant claims that his trial counsel was ineffective because of the presentation of inconsistent defenses.

■ We find no merit in this claim. The psychologist testified about the possible memory lapse or distorted memory. Thus, raising this condition as a defense would not necessarily contradict defendant's denial that he committed the killings. Even assuming the defenses were inconsistent, the decision to advance two different theories of non-culpability is a trial tactic or strategy. It is obvious that defendant's lawyers, who are experienced criminal trial lawyers, were presenting any and all possible defenses. Whether the strategy was good or bad, it was a tactic that is not so unreasonable that it shows ineffectiveness. We keep in mind the admonition of the Supreme Court in *Strickland* that "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." —— U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

Defendant asserts that testimony elicited on cross-examination from the expert who was presented to establish the diminished responsibility defense was so damaging that it "doomed" the defendant and took this decision beyond the scope of trial strategy. Cross-examination of the psychologist revealed his clinical notes from a previous examination of the defendant showing a profile gained from a test which indicates an extremely psychiatrically disturbed and aggressive individual associated with "poorly-executed crimes that exhibit a great deal of savagery and homicidal intents." Cross-examination also revealed that the possibility that the defendant was in a disassociative state was "rather slim." While the expert gave unfavorable testimony on cross-examination, many witnesses have both favorable and unfavorable testimony to offer. As we recently stated:

> After a certain course has proven unsuccessful, it is easy to say some other one should have been tried instead. This is unfair to counsel, who must make a choice between existing alternatives *before* the fact. We have refused to assume the role of Monday morning quarterback in condemning counsel's judgment in choosing between what are frequently equally hazardous options available to him.

*State v. Wilkens*, 346 N.W.2d 16, 19 (Iowa 1984) (emphasis in original) (quoting *State v. Newman*, 326 N.W.2d 788, 795 (Iowa 1982)).

■ We must examine this evidence, gleaned by an astute prosecutor on cross-examination, under the totality of the circumstances. *Wilkens*, 346 N.W.2d at 18; *Sallis v. Rhoads*, 325 N.W.2d 121, 122 (Iowa 1982). The State had presented a vivid and detailed account of defendant's activities in committing two brutal killings through the testimony of a claimed eyewitness. Two persons testified that defendant had admitted to each that he was the killer. Although defense counsel made vigorous attempts to impeach the witnesses, their success was questionable. This twenty-four-year-old defendant's credibility would obviously be severely challenged by his two felony convictions, prior imprisonment, drug usage and dealings, possession of guns, lifestyle and bizarre appearance. A hearing before the court considering whether defendant would choose to testify reveals that defense counsel could not be certain that defendant would testify. Counsel undoubtedly were aware of the matters revealed in his testimony. While he denied the killings, he was less than positive concerning his presence with Billy Rickabaugh at the time Billy said the killing occurred, as indicated by his answer to that question: "[e]vidently not. Not to my

knowledge, no." This answer dovetails with the psychologist's testimony concerning the memory of a person in a disassociative state and supports the dual defense of denial and diminished capacity. Under the total circumstances of this case, including defendant's own uncertainty as demonstrated by this testimony, we cannot find that the defense attorneys' performance fell outside the wide range of normal professional competency.

Our review of the entire record shows that defendant's attorneys mounted a vigorous and able defense with normal decisions and strategy. We find that defendant has not met his burden of showing that his counsel were so ineffective they were not functioning as the "counsel" guaranteed by the sixth amendment. Additionally, we find that counsel's performance was not so deficient as to undermine the trial process and prevent a fair trial.

For the reasons stated, we affirm the judgments and sentences.

AFFIRMED.