[Cite as *State v. Person*, 2017-Ohio-2738.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

   Plaintiff-Appellee, :    No. 16AP-12
             (C.P.C. No. 14CR-1714)

v. :

             (REGULAR CALENDAR)

Raphael Person, :

   Defendant-Appellant. :

---

D E C I S I O N

Rendered on May 9, 2017

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.

**On brief:** *Barnhart Law Office LLC*, and *Robert B. Barnhart*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Raphael Person, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of murder, aggravated burglary, kidnapping, aggravated robbery, and impersonating a peace officer.

{¶ 2} On April 3, 2014, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, one count of murder, in violation of R.C. 2903.02, one count of aggravated robbery, in violation of R.C. 2911.01, one count of kidnapping, in violation of R.C. 2905.01, one count of aggravated burglary, in violation of R.C. 2911.11, one count of impersonating a peace officer or private policeman, in violation of R.C. 2921.51, and one count of having a weapon while under disability, in violation of R.C. 2923.13.

{¶ 3}   The matter came for trial before a jury beginning December 1, 2015.  The first two witnesses for plaintiff-appellee, State of Ohio, were Columbus Police Officers Willie Chears and David A. Younker.  In the early morning hours of May 2, 2012, Officers Chears and Younker were working a special duty assignment at the Wedgewood Apartments, located on the west side of Columbus; on that date, the officers heard the sound of gunshots in the neighborhood just west of the apartments.  The two officers left the apartment complex and drove west on Eakin Road toward Holly Hill Drive.  The officers observed a group of people near a house on Holly Hill Drive "pointing in the direction" of the house.  (Tr. Vol. II at 116.)  These individuals informed the officers they heard gunshots inside a residence on Holly Hill Drive, and that a white van had just left the area heading southbound on Holly Hill Drive.

{¶ 4}   The front door of the residence was open.  Officers entered the house and Officer Younker observed a woman near a couch crying, and "a male directly in front of us [lying] against the wall with blood on his shirt stating he had been shot."  (Tr. Vol. II at 121.)  The man on the ground "said two people came through the door * * * in masks and wearing tactical gear."  (Tr.  Vol. II at 127.)  He told officers that "when they came through * * * they yelled Columbus Police SWAT and * * * pretty much brought the female in and pushed her inside the house when they entered."  (Tr. Vol. II at 128.)  The woman told officers there were "four individuals" involved in the incident.   (Tr. Vol. II at 102.)  Officers found shell casings near the front door.  Paramedics arrived and transported the shooting victim to the hospital where he subsequently died.

{¶ 5}   Jeremiah Schrack, age 35, resides on Holly Hill Drive.  On the evening of May 2, 2012, a friend gave Schrack a ride home; as they neared his residence, Schrack observed a van slowing down in the area and the driver appeared to be looking for an address.  After arriving home, Schrack sat in his friend's vehicle for a few minutes talking.  Schrack then heard gunfire, and he exited the vehicle to "get a better view."  (Tr. Vol. II at 144.)  Schrack heard at least seven gunshots coming from the area where they had earlier passed the van, near the intersection of Harwood Road and Holly Hill Drive.  Schrack then observed "people exiting * * * the house.  There was initially a couple people that left.  One person lagged behind.  I could see that they were carrying * * * a large assault weapon."  According to Schrack, "it looked like they were trying to signal to somebody else to hurry up and come along, and then I saw another person exit and enter the van at this

point." (Tr. Vol. II at 149.) Schrack observed three individuals enter the van; the driver of the van then drove past Schrack and "turned right onto Sexton" Drive. (Tr. Vol. II at 150.)

{¶ 6} Randy Abel, Jr., age 34, is the brother of the shooting victim, Brandon Leonard. In 2012, Abel, who is paralyzed from the waist down, resided on Holly Hill Drive with Leonard. On the evening of May 2, 2012, Leonard and his girlfriend, Arlie Bernard, arrived at the Holly Hill Drive residence; Leonard came into Abel's room to speak with him. While they were talking, Bernard approached and asked Leonard if he would retrieve something from the car for her. Leonard said "no, not right now." (Tr. Vol. II at 277.) Bernard then went out to the car by herself.

{¶ 7} A short time later, Bernard yelled out for Leonard. By the tone of her voice, Abel could sense something was wrong. Leonard ran out of Abel's room, and Abel heard someone say "he's got a gun, Columbus Police, drop the gun, drop the gun, Columbus Police." (Tr. Vol. II at 279.) The voice came from the porch area. Abel then heard between five to eight shots fired. Leonard "ran into" Abel's room and "threw something in the closet and * * * told me that the police was here." (Tr. Vol. II at 281.)

{¶ 8} Leonard ran out of the room, and Abel could "hear them patting him like real hard like where is the gun at, where is the gun at. And he's like, I don't have any -- I don't have no gun." (Tr. Vol. II at 281.) Abel then heard Leonard state he had been shot, and that he needed an ambulance. Abel heard a "second guy with an accent say, [o]kay, we'll -- we're going to get you an ambulance and then they ran out of the house." The next individual Abel observed was a police officer in a uniform; the officer told Abel that those "guys weren't the real cops." (Tr. Vol. II at 282.)

{¶ 9} Bernard testified that she dated Leonard "off and on," and that she was dating him on the date of the incident. Bernard referred to Leonard as "Mikey." (Tr. Vol. II at 298.) On the evening of May 2, 2012, Bernard planned to spend the evening at Leonard's residence on Holly Hill Drive. After arriving at the residence, Bernard went outside to get some items from Leonard's car. Bernard observed a van near the curb, but she did not pay attention to it at first. As she was removing items from the trunk of the car, "three guys ran up to me and told me they was Columbus Police. They told me to drop everything that I had in my hands, and one guy grabbed me from behind." (Tr. Vol. II at 303.) The three men "had all black on. They were wearing masks and they were

dressed from head to toe in black." (Tr. Vol. II at 305.) The word "police" was displayed in yellow lettering on their clothing. (Tr. Vol. II at 306.)

{¶ 10} The men questioned Bernard as to "who was in the house," and she told them that "Mikey" and Abel were inside. One of the men told her to "yell for Mikey" as they walked inside the house. (Tr. Vol. II at 306.) Bernard testified that she entered the residence and "yelled for Mikey. Mikey came down the hallway. I heard somebody say, He's got a gun. He walked back down the hallway and came back without the gun and that's when they started shooting him." (Tr. Vol. II at 308.) The three men were carrying rifles. Bernard testified that when Leonard came down the hallway the second time he did not have a weapon; Leonard "came out with his arms up and they started shooting him." (Tr. Vol. II at 310.)

{¶ 11} On cross-examination, Bernard stated she believed Leonard owned a weapon, but she had never observed him with it. Bernard also testified that Leonard sold cocaine. On re-direct examination, Bernard stated she told detectives the intruders had a Spanish accent.

{¶ 12} Mickey Velazquez, age 30, is currently serving a 30-year sentence in a federal prison on an unrelated robbery and firearm conviction after entering into a federal plea agreement. Velazquez also entered, pursuant to a plea agreement in Ohio, guilty pleas to involuntary manslaughter, aggravated robbery, and aggravated burglary arising out of the events in the instant case involving the death of Leonard. In exchange for his testimony in this case, Velazquez received a state sentence of 22 years to be served concurrently with his federal sentence.

{¶ 13} In May 2012, Velazquez resided on Brookside Boulevard. He worked as a tattoo artist at Columbus Ink, located on Demorest Road. Velazquez's brother owned the tattoo shop and also operated a cell phone store adjacent to the tattoo shop. Velazquez is a friend of Ricardo Velazquez-Flores ("Flores"), as well as Jonathan Flores-Oquendo ("Oquendo"). Velazquez has known appellant for "about six years." (Tr. Vol. III at 362.)

{¶ 14} Velazquez gave the following testimony as to the events of May 2, 2012. On that date, Velazquez, along with Flores, Oquendo, and appellant, drove to "a guy's house to rob them." (Tr. Vol. III at 367.) According to Velazquez, it was appellant's idea to commit the robbery which both men had discussed one day at the tattoo shop.

{¶ 15} On the date of the incident, appellant phoned Velazquez and told him to "call the other two guys, Ricardo and Jonathan, and that we was going to go rob the house." (Tr. Vol. III at 369.) Velazquez phoned Flores and Oquendo from his home. Appellant came to Velazquez's house "and he brought * * * a bag with * * * assault rifles. And then he said he was going to leave so he could check the victim's house, make sure they was there." (Tr. Vol. III at 370.) After appellant left, Velazquez went to the garage and "opened a duffle bag and there [were] two assault rifles." Flores and Oquendo arrived, and Velazquez loaded the assault rifles. After several hours, appellant returned and told Velazquez "it was a go, that they was there. And we got dressed in all black." (Tr. Vol. III at 371.) Appellant "brought shirts that say 'police.' " (Tr. Vol. III at 372.)

{¶ 16} The four men got into a Honda Odyssey minivan belonging to Velazquez, with Flores acting as the driver. The men brought two assault rifles and a shotgun, as well as a sledgehammer "to break their door." (Tr. Vol. III at 373.) Appellant gave Flores directions to the house on Holly Hill Drive.

{¶ 17} On arriving at the address, Velazquez, Oquendo, and appellant "got out of the vehicle and * * * approached a female in back of a vehicle and [appellant] grabbed the female and [they] walked toward the house." (Tr. Vol. III at 376.) Velazquez carried the shotgun, while appellant and Oquendo carried the assault rifles. The three men were wearing black shirts that had "police" displayed on the front. (Tr. Vol. III at 379.)

{¶ 18} As they approached the house, appellant told the woman to "call for the victim. And when she opened the door, she started calling the victim and we went inside the house. And when * * * we seen the victim, [appellant] and [Oquendo] started to shoot." (Tr. Vol. III at 377.) Velazquez recalled "a lot of shots" being fired. The victim appeared from the hallway. Velazquez testified that the victim "had a handgun -- a chrome handgun; and when he seen us, he -- he tried to turn around immediately and ran back toward the hallway." (Tr. Vol. III at 378.)

{¶ 19} After the shooting, Oquendo ran out of the house toward the minivan. Velazquez ran out next, and appellant followed him to the van. Flores drove away, and appellant gave Flores "directions where to go and we went to an area where there was some woods." (Tr. Vol. III at 380.) The men had earlier stolen a license plate, and they took the plate off the vehicle at that time; they also removed the weapons and sledgehammer from the minivan. Appellant and Oquendo remained in the wooded area,

while Velazquez and Flores drove back to Velazquez's residence.  According to Velazquez, the men had intended to "get money and drugs" from the Holly Hill residence but they left with nothing.  (Tr. Vol. III at 384.)

{¶ 20} On May 4, 2012, SWAT officers arrived at the home of Velazquez. Velazquez testified officers were conducting an investigation related to his federal robbery case, and they recovered a number of items from the residence including hoodies, masks, bulletproof vests, and a shotgun used during the incident at Holly Hill Drive.  In March 2013, Velazquez was arrested in Florida and extradited to Ohio on federal charges.  On July 9, 2013, Velazquez entered into a proffer statement, at which time he informed law enforcement authorities of his involvement in the Holly Hill Drive shooting.  At trial, Velazquez identified state's exhibit M1 as the state plea agreement he entered in exchange for his testimony in this case; he also identified state's exhibit M2 as his federal plea agreement.

{¶ 21} On cross-examination, Velazquez related that, on one occasion prior to the incident, he observed Leonard at the tattoo shop.  Velazquez had also, prior to the incident, once performed a tattoo on Bernard.  Velazquez testified he did not fire any shots during the incident.  He stated they ran out of the house without looking for drugs or money because the noise from the shooting "attracted people."  (Tr. Vol. III at 428.)

{¶ 22} Oquendo, age 23, is currently incarcerated in a federal facility in West Virginia, serving a 28-year sentence for a robbery and firearm conviction after entering into a federal plea agreement.  He also entered into a plea agreement with the state to testify in this case.  Oquendo and Flores are cousins, and Oquendo is acquainted with Velazquez and appellant.

{¶ 23} Oquendo gave the following testimony with respect to the events of May 2, 2012.  On that date, Oquendo, appellant, Flores, and Velazquez drove to the residence on Holly Hill "[b]ecause we were going to rob * * * it" of drugs and money.  (Tr. Vol. III at 507.)  Earlier that day, Velazquez called Oquendo and asked him to participate in the robbery.  Oquendo met up with the others at the home of Velazquez; when he first arrived, Flores and Velazquez were at the residence.  Appellant arrived later, and they began to discuss the robbery.  Oquendo did not speak English at the time, while Velazquez and Flores both spoke English as well as Spanish.

{¶ 24} Oquendo testified that the plan was for appellant, Velazquez, and Oquendo to enter the Holly Hill residence "and rob what was inside the house." The men were all dressed in black, and Velazquez and appellant "had a shirt that said 'police.' " (Tr. Vol. III at 511.) Appellant brought the shirts to the house. The men also had "masks to cover our faces completely. You could only see our eyes." (Tr. Vol. III at 512.) Appellant, Velazquez, and Oquendo were also wearing bulletproof vests. The men had two rifles and one shotgun; Oquendo and appellant each carried one of the rifles, while Velazquez carried the shotgun. According to Oquendo, it was Velazquez's idea to rob the home.

{¶ 25} Flores drove the men in a van to the Holly Hill location and parked the van in front of the residence. As they were sitting in the van, a woman came outside of the residence and began looking for something in the trunk of a car. Velazquez "got out and went straight toward the woman." (Tr. Vol. III at 520.) The woman was "very scared" and she "lifted her hands." (Tr. Vol. III at 521.) Velazquez, appellant, and Oquendo entered the house, and a man came out of a bedroom and into the living room; the man "had a pistol." Oquendo testified that appellant "started shooting." (Tr. Vol. III at 523.) Oquendo also fired two shots. The man "fell on the floor and he started screaming as if he had been hit by a shot." (Tr. Vol. III at 525.)

{¶ 26} After the shooting, Oquendo and the others left the house and fled the scene in the van. Appellant had a cell phone "which tracked police," and the men learned that "the van had been reported." (Tr. Vol. III at 527.) They then drove to a wooded area to dispose of the weapons. When they arrived at the location, Oquendo handed the weapons and vests to appellant, who took them into the woods. The men also changed the license plate on the van. The four men then split up; Velazquez and Flores drove to Velazquez's house, while appellant and Oquendo "started walking in that area waiting for another person to come pick us up." They split up because "the van had already been reported and we were afraid we would all get caught together." (Tr. Vol. III at 530.) An individual subsequently arrived and picked up appellant and Oquendo in a red Cavalier, and they drove to the home of Velazquez.

{¶ 27} In 2012, Flores, age 24, resided with his parents at a residence on Trabue Road. Flores is currently serving a 17-year federal prison sentence for aggravated robbery with a firearm in an unrelated case. Flores also entered, pursuant to a plea agreement in Ohio, a guilty plea to involuntary manslaughter and aggravated robbery arising out of the

death of Leonard; Flores received a 10-year state sentence in exchange for his testimony in this case.

{¶ 28} Flores and Oquendo are cousins, and Flores is a friend of Velazquez. Velazquez introduced Flores to appellant in 2011. On May 2, 2012, Flores received a phone call from Velazquez "asking me if I wanted to go * * * do a robbery and I agreed." (Tr. Vol. IV at 596.) Flores went to the residence of Velazquez, where Velazquez and Oquendo were waiting. Appellant arrived approximately one-half hour later. Velazquez was in the garage taking a shotgun apart, and he later began loading some "clips for some AR15s." (Tr. Vol. IV at 598.) Appellant had "two shirts that said 'police' on it. And then * * * we started planning how we was going to go do the robbery." Oquendo, who did not speak English, "didn't really understand much, but he was there." (Tr. Vol. IV at 599.)

{¶ 29} Flores testified that "[t]he plan was just * * * supposedly they had robbed some money from one of them or some drug money or something like that, and we was just supposed to go back and get the money * * * and leave." (Tr. Vol. IV at 599.) Oquendo, Velazquez, and appellant each had rifles; the men also had bulletproof vests and masks. The four men traveled to the Holly Hill residence in a Honda Odyssey minivan; they changed the license plate on the van before arriving at the residence. Flores drove the van, and Velazquez provided him with directions.

{¶ 30} On arriving at the Holly Hill residence, Velazquez, appellant, and Oquendo exited the van; Velazquez and appellant were wearing "police shirts," while Oquendo was wearing a black hoodie. (Tr. Vol. IV at 604.) Flores remained in the vehicle with the engine running. A woman was standing in the driveway with the car trunk open. Velazquez "grabbed her and they took her inside the house." (Tr. Vol. IV at 605.) A short time later, Flores "heard a lot of gunfire." (Tr. Vol. IV at 606.) Flores then observed Oquendo exit the house, followed by Velazquez and appellant. The men got inside the minivan, and Flores asked if anyone had been shot. Velazquez said: "I think I hit him on his stomach." Flores testified that "everybody seemed panicked," and he sped away from the scene. (Tr. Vol. IV at 609.)

{¶ 31} Flores drove to a wooded area and they "dropped off" appellant and Oquendo "with the AR15s, bulletproof vests, everything." They also "changed the license plate back to the original one," and then Flores and Velazquez drove back to Velazquez's residence. (Tr. Vol. IV at 610.) Appellant and Oquendo remained in the wooded area

with the weapons and other items.  Appellant subsequently phoned Velazquez and told him that "somebody had already picked them up."  (Tr. Vol. IV at 613.)  Flores and Velazquez returned to the wooded area and found a sledgehammer left behind.

{¶ 32} Approximately one month later, Flores saw appellant at a local Walmart store.  Appellant told Flores that law enforcement authorities "had picked up" Velazquez.  Appellant told Flores "if they come pick you up, just tell them you don't know nothing."  (Tr. Vol. IV at 616.)

{¶ 33} Police detectives subsequently spoke with Flores in regard to his federal case, and Flores told detectives about his involvement in the Holly Hill shooting, as well as the involvement of Velazquez, Oquendo, and appellant.  On direct examination, when asked why he informed the detectives of the shooting, Flores stated: "[w]hen the detective came to question me, my dad was there at the job site and my dad told me to do the right thing."  (Tr. Vol. IV at 625.)

{¶ 34} On May 4, 2012, Columbus Police Detective Thomas Burton and other detectives participated in the execution of a search warrant of Velazquez's residence on Brookside Boulevard.  At trial, Detective Burton identified items recovered from that search, including bulletproof vests, a 12-gauge shotgun, and live ammunition.

{¶ 35} Following the shooting, police detectives obtained samples from the deceased victim to test for gunshot residue.  Martin Lewis, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI"), testified that the samples obtained from the victim did not indicate the presence of gunshot residue.

{¶ 36} Columbus police officers subsequently recovered a license plate in a wooded area near the intersection of Emmitt and Taft Avenues.  Detectives processed the minivan, taking photographs and dusting for fingerprints. The detectives found rounds of ammunition for a semi-automatic rifle, as well as a round of ammunition for a small firearm.  Robert Lawson, a supervisor with the latent fingerprint section of the Columbus Police Department, identified at trial a fingerprint lift from a rear driver's side window of the Honda Odyssey as matching the fingerprint of Mickey Velazquez.

{¶ 37} Joshua Barr, a forensic scientist with BCI, examined shell casings recovered at the crime scene and determined that five of the seven casings "were fired from * * * one gun and the additional two were fired from another gun."  (Tr. Vol. IV at 757.)  Barr testified that both calibers could have been fired from an AR-15 rifle.

{¶ 38} At trial, the parties stipulated that the shooting victim suffered a perforated gunshot wound to the chest and a wound to the left thigh; the stipulation further provided that one of the shots lacerated the victim's liver, colon, and other surrounding organs, and that the cause of death was the result of the gunshot wounds.

{¶ 39} Following deliberations, the jury returned verdicts finding appellant guilty of murder, aggravated burglary, kidnapping, aggravated robbery, and impersonating a peace officer or private policeman.  The jury returned a not guilty verdict on the charge of aggravated murder, and the trial court made a separate finding of not guilty as to the charge of having a weapon while under disability.[1]  On December 8, 2015, the trial court filed a judgment entry imposing a total sentence of 41 years to life imprisonment.

{¶ 40} On appeal, appellant sets forth the following two assignments of error for this court's review:

> [I.] APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [II.] APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 41} Under his first assignment of error, appellant challenges his convictions as being against the manifest weight of the evidence based on his contention that the only witnesses linking him to the crime, his alleged accomplices, were not credible.  Noting that Velazquez, Oquendo, and Flores all received plea deals in exchange for their testimony,  appellant argues that each witness obtained what essentially amounted to a "free pass" from the state, i.e., that each received concurrent time molded such that, with appropriate federal reductions, each would not serve a day longer than the federal sentence he already received.  According to appellant, in light of the bargains given to each co-defendant, and the lack of other physical evidence linking him to the crime, this court should find the testimony of the co-defendants to be unreliable and self-serving.

{¶ 42} In considering a manifest weight challenge, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

---

[1] In separately considering the weapon under disability charge, the trial court ruled that the state's sole witness could not testify due to a potential conflict of interest.  The court thus determined that the state had failed to present sufficient evidence as to that count and entered a judgment of acquittal.

conviction must be reversed and a new trial ordered." *State v. Ryan,* 10th Dist. No. 08AP-481, 2009-Ohio-3235, ¶ 40, citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). Further, "[t]he discretionary power to reverse on manifest weight grounds should be exercised only in the exceptional case in which ' "the evidence weighs heavily against the conviction." ' " *Id.,* quoting *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 43} As set forth above, appellant was convicted of murder, kidnapping, aggravated robbery, aggravated burglary, and impersonating a peace officer. R.C. 2903.02(B) defines the offense of murder and states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶ 44} The offense of kidnapping is defined under R.C. 2905.01(A) in part as follows:

> No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another.

{¶ 45} R.C. 2911.01(A), which sets forth the elements of aggravated robbery, provides in part:

> No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>
> * * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 46} The offense of aggravated burglary under R.C. 2911.11(A) is defined as follows:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 47} R.C. 2921.51(E) proscribes the offense of impersonating a police officer, and states in part: "No person shall commit a felony while impersonating a peace officer."

{¶ 48} On review, we find unpersuasive appellant's argument that the testimony of the three co-defendants was not sufficiently credible because they each received plea agreements in exchange for their testimony. We initially note that, while there may have been some discrepancies in the accounts, the testimony of Velazquez, Oquendo, and Flores as a whole was consistent regarding their descriptions of the events occurring before, during, and after the shooting. All three co-defendants testified that they, along with appellant, met at the home of Velazquez prior to driving to the Holly Hill residence, and that the plan was to rob the residents of drugs and money. Velazquez testified that it was appellant's idea to commit the robbery, and that appellant told Velazquez to contact Flores and Oquendo. Flores related that he received a call from Velazquez asking if he wanted to "do a robbery," and he agreed. According to Velazquez, appellant arrived at his residence with assault rifles, and then told Velazquez he was going to go "check the victim's house" to make sure he was home. After appellant left, Oquendo and Flores arrived at Velazquez's residence. Velazquez testified that appellant returned several hours later and had black shirts that displayed "police" on the front. Oquendo and Flores similarly testified that appellant brought shirts with a police logo.

{¶ 49} All three co-defendants indicated that Flores was the driver of the minivan that evening. According to the testimony of Oquendo, the plan was for appellant, Velazquez, and Oquendo to enter the residence and commit the robbery. Oquendo and Velazquez both testified that appellant and Oquendo carried rifles, while Velazquez carried a shotgun. All three co-defendants related observing a woman standing outside the residence retrieving items from a vehicle, and that Velazquez, Oquendo, and appellant exited the minivan and walked toward the woman; the men grabbed the woman and approached the house, telling the woman to call out for Leonard. Velazquez testified that, on seeing Leonard, both appellant and Oquendo began shooting at him. Oquendo, who acknowledged firing two shots during the incident, stated that when the man came out of the bedroom into the living room, appellant "started shooting." A firearms expert opined that, based on the shell casings recovered, one of the rifles fired two shots while the other rifle fired five shots.

{¶ 50} The co-defendants all testified that they fled the shooting scene in the van and drove to a wooded area where they hid the weapons and other items used during the incident; further, all of the co-defendants related that appellant and Oquendo remained in the woods, while Velazquez and Flores returned to Velazquez's residence.

{¶ 51} While appellant challenges the credibility of the co-defendants based on the plea agreements, the jury was made aware of the plea deals entered by each of the co-defendants. Defense counsel also questioned each of the co-defendants on cross-examination as to their plea agreements, and challenged their motivation to testify. During closing argument, appellant's counsel emphasized to the jury the fact that all three co-defendants received plea deals. Further, as noted by the state, one of the co-defendants, Flores, implicated appellant (as well as the other co-defendants) prior to receiving a plea deal. The jury, having heard the testimony of the co-defendants as well as being informed of the plea agreements, was free to determine whether to credit all, part, or none of their testimony, and we defer to the jury's credibility assessment. *See State v. Rodriguez-Baron,* 7th Dist. No. 07-MA-86, 2008-Ohio-4816, ¶ 34 (declining to second-guess jury's determination that co-defendant's testimony was credible; jury heard co-defendant explain he was testifying as part of a plea deal and that some of the charges against him were dropped because of his cooperation with the state); *State v. Royal,* 8th Dist. No. 93903, 2010-Ohio-5235, ¶ 22 (deferring to jury's credibility determination in

case where jury was aware of co-defendant's participation in crime as well as the fact co-defendant received a deal for cooperating with police).

{¶ 52} The fact that the testimony of the three co-defendants constituted the primary evidence against appellant does not render his convictions against the manifest weight of the evidence. *See State v. Berry,* 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 17-18 (rejecting defendant's claim that his convictions were against the manifest weight of the evidence based on assertion that accomplice was not a reliable witness and because state failed to present physical evidence linking him to the crime scene; jury was made aware of accomplice's involvement in murders, his willingness to testify against defendant, as well as his attempt to minimize his role); *State v. Peeples,* 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21 ("a lack of physical evidence, standing alone, does not render appellant's conviction against the manifest weight of the evidence").

{¶ 53} We also note that the trial court provided the jury a cautionary instruction regarding the testimony of an alleged accomplice. Specifically, the court instructed the jury that "the admitted or claimed complicity of a witness may affect his credibility and may make his testimony subject to greater suspicion and require that it be weighed with great caution," and that it was up to the jurors to "evaluate such testimony and to determine its quality and worth or its lack of quality and worth." (Tr. Vol. V at 892.) Having "received an instruction on weighing the credibility of accomplice testimony," it is presumed the jury followed the trial court's instructions. *State v. Gott,* 6th Dist. No. L-99-1152 (July 21, 2000).

{¶ 54} In the present case, the co-defendants presented considerable, detailed testimony linking appellant to the scene and the criminal activities leading to the death of Leonard. Based on the verdicts rendered, the jury obviously found credible their testimony identifying appellant as a willing participant in the events at issue, and we defer to the credibility determinations of the trier of fact. In light of evidence presented, we cannot conclude that the jury lost its way and committed a miscarriage of justice in rendering its verdicts. Accordingly, we find unpersuasive appellant's contention that his convictions are against the manifest weight of the evidence.

{¶ 55} Appellant's first assignment of error is overruled.

{¶ 56} Under his second assignment of error, appellant asserts his trial counsel provided ineffective assistance of counsel. Specifically, appellant contends his trial

counsel was ineffective in presenting one theory during opening statement while advancing a completely different theory during closing argument.

{¶ 57} Under Ohio law, trial counsel's performance "will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Further, in order to show a defendant has been prejudiced by his or her counsel's deficient performance, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 58} As noted, appellant contends his trial counsel was ineffective for presenting two completely different and, according to appellant, inconsistent theories to the jury. Appellant argues that counsel initially advanced the theory, during opening statement, that appellant never had the intent to kill anyone, but counsel presented a different theory during closing argument by asserting appellant was not present at the crime scene.

{¶ 59} In support, appellant first cites to portions of defense counsel's opening statement in which counsel stated in part: "We believe that the evidence will show that at no time did [appellant] ever have the intent to kidnap or kill anyone. We believe the evidence will show that, specifically that there was no intent of [appellant] to cause the death of Brandon Leonard." (Tr. Vol. II at 84.) Appellant then cites to comments by his counsel during closing argument in which counsel informed the jury that his argument was "going to be a little different than what I anticipated." (Tr. Vol. V at 853.) Appellant notes that his counsel then proceeded to advance the theory there was a lack of physical evidence linking him to the shooting scene.

{¶ 60} Appellant contends the argument made by defense counsel during opening statement (i.e., that he did not intend to kidnap or kill anyone) was absurd in light of anticipated trial testimony that individuals went to the residence dressed in black and carrying assault rifles. By contrast, appellant contends, the theory espoused by his counsel during closing argument (i.e., that appellant was not present at the crime scene) made greater sense. According to appellant, defense counsel would have been better off waiving opening statement and, instead, simply arguing lack of identity during closing argument.

Appellant maintains that his counsel's performance was deficient in having to change his defense to comport with the anticipated evidence.

{¶ 61} In response, the state initially argues there is nothing in the record on appeal to indicate why defense counsel made the particular statements during opening statement and closing argument. The state further argues that defense counsel's statements, when viewed in context, reflect that counsel did not completely change his defense. In support of this latter contention, the state first cites the following portion of defense counsel's opening statement in which he argued in part:

> We discussed in the voir dire, which is really the beginning of the process, and we believe that the evidence is primarily going to be based on what we call purchased testimony or snitches, which we talked about in the opening voir dire. What we believe is primarily the testimony that you will hear and that the evidence will show is that it is an attempt to place these building blocks in place, an attempt to prove each and every one of these elements in order to add up that only Raphael Person is guilty of these crimes.
>
> We believe that the testimony that you're going to hear will be testimony that you'll have to weigh, as in every case. We believe the evidence will show that testimony can only be given weight by you, the jury, and that weight will be assigned based on all the facts and surrounding circumstances that you hear in regard to that testimony.
>
> Throughout all of this, we want you to be cognizant of the fact that the State of Ohio has the burden of proof. They -- they are going to have to prove each one of those elements. They're going to have to prove each one of those building blocks; and if they can't prove each one of them, then there's only one verdict that you should find and that verdict should be not guilty as to that charge.
>
> We believe that the evidence will show that on May 2, 2012, Brandon Leonard was shot and killed in his home. We believe that the evidence will show that several masked men entered the home in an attempt to rob Mr. Leonard and something went terribly wrong. Of course, when there's a death of somebody, we all feel sympathy for that family. The case cannot be decided on sympathy or empathy.
>
> We believe that the evidence will show that at no time did Raphael Person ever have the intent to kidnap or kill anyone. We believe that the evidence will show that, specifically that

there was no intent of Raphael Person to cause the death of Brandon Leonard. The State of Ohio has a high burden and we trust that you will hold them to that burden.

We believe that when you weigh all the evidence that you receive in this trial and you listen to the testimony of the witnesses and you will give that testimony the proper weight and that you will be fair and impartial, fair and impartial as you deliberate, because we believe that if you do these things, you will find that Mr. Person is not guilty of aggravated murder. We believe that if you are fair and impartial and weigh all of the evidence, you will find that Mr. Person is not guilty of murder. We believe that the evidence will show that Mr. Person is not guilty of kidnapping. We believe the evidence will show that Mr. Person is not guilty of robbery and that Mr. Person is not guilty of impersonating an officer.

(Tr. Vol. II at 83-85.)

{¶ 62} The state then cites to the following initial comments of defense counsel during closing argument:

And -- and as I do my closing -- and it's going to be a little different than what I anticipated, but I'm not trying to confuse you or misstate anything. And if I do misstate something that you heard as evidence and I said it wrong, incorrect or differently, depending on your notes -- now, I'm not trying to change anything and if I misstate something, I apologize, but rely on your notes and what you heard more so than what I say somebody said, okay.

* * *

And I think this whole case is somewhat confusing; and the more I participate, the more I look at it, the more confusing it gets. Because they started talking about complicity and aiding and abetting, and -- and part of that discussion she brought up that doughnut example from voir dire and -- and all that begs the question of what if Mr. Person wasn't there. I mean, if three people robbed the doughnut shop and you weren't one of the three people, what if you weren't there? Then you're not complicit. You're not an aider and you're not an abettor. You weren't there. It's not you.

And, see, in all of this, they're assuming Mr. Person was there. But you heard the testimony. You heard -- you heard the testimony from this chair and you have to think about that. What if he didn't participate, because when you look at * * *

all the evidence you'll have in the back room and all the evidence you have seen in this trial, the bullet casings, the -- the fragments, the -- the pictures, the this, the that, there's no evidence regarding Mr. Person. There's no fingerprints. There's no DNA. There's no blood. There's nothing, nothing. So you've got to start thinking about this.

(Tr. Vol. V at 853-54.)

{¶ 63} The state additionally directs our attention to the next comments in defense counsel's closing argument:

Ms. Farnese talked about the agg rob, the attempt. You know, I'm thinking what was the attempt? What is this? What really happened on May 2, 2012?

These guys go to a house, a young lady is in the driveway. They go in the driveway -- I mean, they get out of the car, they grab her. They go into the house, shooting erupts, they leave. There's no attempted robbery. No one says give me the drugs, give me the money, give me anything. Nobody looks for anything. Nobody searches for anything. No one looks for drugs. No one looks for money, nothing.

(Tr. Vol. V at 855-56.)

{¶ 64} Finally, the state cites to the following further portion of defense counsel's closing argument:

The kidnapping * * * [w]as she a part of all this? Think about this. There's no attempt to rob. Who did Mickey Velazquez know? Who did he know? He knew the deceased and he knew both of his girlfriends. Mickey Velazquez knows everybody in this. He knows his crew, Ricardo and Jonathan, and he knows the deceased. He met him in the tattoo shop. He knew both of his girlfriends, tattooed them both. Made me think, what's going on here.

Was Ms. Bernard in the driveway by chance or on purpose?

* * *

The aggravated murder, that goes back to what was really going on, who was there, who really was there. Was there just going to that house with the purpose to rob for money and drugs or was it -- did somebody have the purpose to kill when they went to that house? Was there a person that had that intent?

See, and -- and -- and that becomes significant because if one person -- if Mickey Velazquez had the intent to kill, he's the only one who knew that, because it didn't sound from the other's testimony that he expressed it to them, hey, this is a hit, I'm going to kill this guy.

If only Mickey Velazquez had that intent, the person that they gave that deal to -- you know, part of that doughnut example we talked about and -- and snitches and purchased testimony, we talked about Jeffrey Dahmer and who is the people who would have witnessed Jeffrey Dahmer's death in prison and if they got a deal. Well, and then I asked the question, what if the person getting the deal wasn't a Jeffrey Dahmer. Wouldn't you want to know the motivation to say what they said? Was Mickey Velazquez motivated to say what he said? Is this one big setup? Think about this. It's not black and white.

(Tr. Vol. V at 856-58.)

{¶ 65} The state argues that statements by defense counsel during opening statement (i.e., in which counsel asserted the prosecution's testimony was purchased, that the state had the burden of proof, and that appellant did not possess the necessary intent to kidnap or kill anyone) were rather vague. By contrast, the state contends, defense counsel's arguments during closing were more specific, whereby counsel argued appellant was not present and the testimony of the co-defendants should not be believed in light of the plea deals they received.

{¶ 66} The state further argues that the closing argument indicates counsel was not abandoning his defense that appellant lacked the necessary intent to commit the crimes; rather, the state asserts, counsel's focus was on the argument that Velazquez was actually the mastermind and that it was possible he was working with Bernard to do a "hit" on the victim (a line of argument that would also, presumably, cast doubt in the jury's mind as to whether Bernard had been kidnapped). The state maintains that defense counsel also argued this "hit" theory to show that only Velazquez had the necessary intent to kill. According to the state, the theories were not inconsistent, i.e., if appellant was not present, the evidence would show he did not possess the necessary intent to commit the crimes at issue.

{¶ 67} On review, we do not find the comments by defense counsel during opening statement constituted deficient performance. In general, "debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146. Further, "it is not necessarily deficient performance for defense counsel to present inconsistent alternative theories to the jury. * * * Nor does a midtrial change in strategy necessarily constitute deficient performance." *State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 134. The Supreme Court of Ohio has recognized that, over the course of a trial, counsel may be required to "ma[k]e a tactical decision to adjust their approach." *State v. Cepec,* ___ Ohio St.3d ___, 2016-Ohio-8076, ¶ 110.

{¶ 68} As noted by the state, comments by defense counsel during opening statement, in which counsel stated that appellant did not have the intent to commit the crimes at issue, were general in nature and made in the context of the state's burden to present sufficient evidence as to each of the elements of the offense. Viewed in that light, we agree with the state that discussion of intent was not necessarily inconsistent with the statements advanced during closing argument.

{¶ 69} Further, while the record is silent as to defense counsel's mindset in presenting his opening statement and closing argument, counsel arguably may have sought to place two theories before the jury "without falling completely into the trap of inconsistent argument." *State v. Adeyanju,* Wis. App. No. 2007AP2388-CR (July 16, 2009) (by raising issue of intent only in a "limited way, counsel was able to direct the jury's attention to both theories of defense, without having to openly argue that [defendant] was not present, but if he was, he lacked intent"). Specifically, defense counsel may have chosen to focus on the theory that appellant was not present while alternatively suggesting, in the event the jury believed the testimony of the three co-defendants placing him at the scene, that he was unaware of the intent of Velazquez to do a "hit" on the victim.

{¶ 70} In any event, we do not view counsel's remarks as to appellant's intent as per se unreasonable based on the circumstances and the record on appeal, and we note that the jury acquitted appellant of the aggravated murder count. Under Ohio law, "presenting inconsistent alternative theories is not per se deficient performance." *Mundt* at ¶ 140. As such, it has been held that, " '[e]ven assuming the defenses were inconsistent, the decision to advance two different theories of non-culpability is a trial tactic or

strategy,' " and whether the strategy of a defendant's lawyers in presenting " 'any and all possible defenses * * * was good or bad, it is a tactic that is not so unreasonable that it shows ineffectiveness.' "  *Id.,* quoting *State v. Losee,* 354 N.W.2d 239, 244 (Iowa 1984). Here, even accepting appellant's claim that theories advanced by his counsel were inconsistent, we do not find deficient performance.

{¶ 71} Furthermore, even assuming counsel was somehow deficient in presenting inconsistent theories, appellant has failed to demonstrate prejudice.  Rather, based on the evidence presented and previously discussed, we conclude there is no reasonable probability that, but for counsel's unprofessional errors, "the result of the trial would have been different."  *Bradley* at paragraph three of the syllabus.

{¶ 72} Accordingly, appellant's second assignment of error is without merit and is overruled.

{¶ 73} Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

_____