[Cite as *State v. Williams*, 2018-Ohio-3792.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106484**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# DOMINIQUE WILLIAMS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-615064-A

**BEFORE:** Jones, J., S. Gallagher, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** September 20, 2018

[Cite as *State v. Williams*, 2018-Ohio-3792.]

**ATTORNEY FOR APPELLANT**

James J. Hofelich
614 West Superior Avenue, Suite 1310
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY:    Sean Kilbane
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Dominique Williams ("Williams") appeals his conviction for crimes associated with a February 25, 2017 shooting that occurred outside of the M&M Saloon in Cleveland, and that resulted in the death of Derrick Yanetta ("Yanetta") and shots being fired at peace officer Richard Schilling ("Schilling"). For the reasons that follow, we affirm.

## I. Factual and Procedural History

{¶2} In March 2017, Williams was indicted on the following charges: Count 1, aggravated murder (victim Yanetta); Count 2, murder (victim Yanetta); Count 3, felonious assault (victim Yanetta); Count 4, attempted murder (victim Schilling); Count 5, felonious assault (victim Schilling); and Count 6, having weapons while under disability. With the exception of Count 6, the charges had accompanying one- and three-year firearm specifications. The case proceeded to a jury trial, at which the following pertinent facts were established.

**Shooting at the Bar**

{¶3} The M&M Saloon is located on Lorain Avenue near W. 125th and W. 126th Streets in Cleveland. At the time in question, Schilling, a police officer, was working off-duty as a security guard at the bar. His job was to pat down every customer that entered the bar in order to enforce the bar's zero tolerance for weapons on the premises and also to check identifications to make sure patrons were of age. Schilling testified that his pat-down searches were "thorough," and that if a patron attempted to bring a

"normal sized" firearm into the bar he would have detected it. Schilling was dressed in his police uniform and was armed with his service weapon.

{¶4} Surveillance video from the bar shows Schilling patting down Williams before he enters the bar sometime between 1:20 a.m. and 1:30 a.m. on the day in question. After Williams is cleared for entry, video surveillance shows him entering the bar; once inside, he is seen dancing, singing, and mingling with patrons.

{¶5} The video shows victim Yanetta being patted down by Schilling at 2:24 a.m. Yanetta was cleared and entered the bar. Williams is seen on the video looking in Yanetta's direction. Williams, who had been dancing, stopped dancing, whispered into an unknown patron's ear, and exited the bar. The victim remained in the bar for the next few minutes, talking to various female patrons.

{¶6} At 2:35 a.m., Yanetta exited the bar. Approximately two minutes later the video shows Schilling drawing his weapon and running out the front entrance of the bar — Schilling testified that he did so in response to hearing gunshots outside.

{¶7} According to Schilling, as soon as he got outside, he saw Yanetta laying by the front entrance of the bar with several holes in his t-shirt. People outside the bar were "indicating" in a certain direction, and when Schilling looked in that direction he saw a man running away from the scene with a firearm in his right hand. Schilling pursued the suspect on foot, calling out "police" several times. The man continued to run, however, and eventually, the suspect turned around and extended his right arm with the gun turned sideways. Schilling and the suspect then exchanged gunfire.

{¶8} Schilling testified that he was not sure who fired first, but admitted that a few days after the incident he told a detective that he (Schilling) had fired first. According to Schilling, he fired three or four shots before ducking into a doorway to call for backup; it was later determined, however, that Schilling had fired eight times. Schilling also testified that, at the time, he did not know whether his shots had hit the suspect. He also admitted that he never saw the suspect's face.

{¶9} Schilling saw the suspect "fall out" of one the boots he was wearing, then he lost sight of him. By that time, officers from the Cleveland Police Department had arrived on scene. One of the officers, James Hollenbeck ("Officer Hollenbeck"), immediately began searching for the suspect. He found a single boot laying in the front yard of a home on W. 126th Street, and also what appeared to be a trail of blood. He followed the trail, which led him to a house on W. 125th Street. There, he found a man, later identified as Williams, laying in the driveway with a gunshot wound and wearing one boot, a pair of jeans, and a grey-hooded sweatshirt with black stripes on the sleeves. The officer saw blood on the porch of the home, and discovered a firearm under the porch. Body camera footage from Officer Hollenbeck was played for the jury over the defense's objection.[1]

{¶10} One of Williams's friends, Ricardo Stephens ("Stephens"), testified for the state. He stated that he went to the bar with Williams on the day in question.

---

[1] The defense's objection was that Williams made statements before he was advised of his rights.

According to Stephens, Williams did not have a firearm on him that evening, and there was no firearm in the car they were riding in. Stephens testified that he left the bar so that he could smoke. He saw Williams leave the bar but did not talk to him. Moments later, he heard the gunshots and saw a chase ensue, but did not see who Schilling was chasing. The state requested to declare Stephens a hostile witness; the parties stipulated that the state be allowed limited cross-examination of him, during which Stephens admitted that Schilling was in pursuit of Williams.

**Collection of Evidence**

{¶11} Detective Walter Emerick ("Detective Emerick") of the Cleveland police processed the scene. He collected multiple .40 caliber shell casings outside the front entrance of the bar. The firearm he recovered from Officer Hollenbeck, who found it under the porch where Williams was located, was a Sig Sauer .40 caliber firearm; it had blood on it. Officer Emerick also recovered a .40 caliber shell casing near the one boot that was found. Emerick recovered Schilling's 9 mm service weapon and collected 9 mm shells from the scene. Additionally, he collected blood samples from the "trail of blood" and the blood found on the porch of the home where Williams was found.

**Autopsy of Yanetta**

{¶12} Dr. Thomas Gilson, the Cuyahoga County Medical Examiner, testified about the autopsy of Yanetta. Yanetta had nine gunshot wounds to his body, one of which was to his chest area and constituted a "life-threatening injury." A pellet was removed from the body and submitted for testing. The cause of death was the result of multiple

gunshot wounds and the manner of death was homicide.

 **Analysis of Evidence**

{¶13} Kristen Koeth ("Koeth"), a firearm and toolmaker examiner from the Cuyahoga County Regional Forensic Science Laboratory, performed all the ballistics testing in this case.   Her testing included: (1) eleven .40 caliber cartridge casings, (2) one spent pellet from a hospital vial with Williams's name on it; (3) the Sig Sauer .40 caliber gun found under the porch of the house where Williams was found; (4) Schilling's Glock 9 mm firearm; (5) four spent 9 mm caliber cartridge casings, and (5) the pellet removed from Yanetta's body during the autopsy.

{¶14} Koeth testified that she test fired both the Sig Sauer .40 caliber firearm and the Glock 9 mm firearm and they were operable firearms.   She determined that the pellet recovered from Yanetta during the autopsy was from the Sig Sauer .40 caliber firearm, and that the .40 caliber shell casings collected from the scene were also from that weapon.

{¶15} Koeth further testified that the pellet removed from Williams's body was too damaged to do comparative testing, but she testified that it was consistent with 9 mm or .38 special caliber ammunition.   Koeth also testified that the 9 mm casings recovered from the scene came from Schilling's Glock 9 mm firearm.

{¶16} Lisa Moore ("Moore"), a forensic scientist from the Medical Examiner's Office, performed the DNA analysis in this case.   She received a buccal swab from Williams, and used it to make comparisons to other items that were submitted for DNA

testing.  Specifically, she did testing on the blood that was found at the scene where Williams was found and arrested (i.e., blood on the driveway and the porch of the home where he was found, and a nearby back yard).   Moore testified that the DNA from those samples all contained a single source of DNA and matched Williams's DNA. Additionally, Moore performed testing on the Sig Sauer .40 caliber firearm and its magazine and determined that both contained a single source of DNA that matched Williams's DNA.

{¶17} Lisa Przepyszny, a forensic scientist in the Trace Evidence Department of the Cuyahoga County Regional Forensic Science Laboratory, also testified at trial.   After examining Yanetta's clothing, she opined that four of the shots were fired from greater than four feet away and one of the shots was fired from an intermediate range of one to four feet.   She also examined Williams's clothing and found one live "CCI .40 Smith and Wesson" round of ammunition in his jeans pocket.

**Police Investigation**

{¶18} The lead detective on the case was Raymond Diaz ("Detective Diaz"). During the course of his investigation, Diaz recovered a cell phone that was taken from Williams when he was arrested.   A video was recovered from the phone — the video was recorded on the day in question at 1:29 a.m. — which showed Williams with a gun in his hand upon exiting a vehicle.

{¶19} Detective Diaz also testified about learning during the investigation that an individual named Antonio Jones ("Jones") had been with Yanetta on the evening in

question. The detective learned that Jones and Yanetta had arrived at the bar in the same vehicle; Jones remained in the vehicle while Yanetta went into the bar. Detective Diaz testified that he found out that Yanetta went to the bar "to fight." Jones got out of the vehicle when he heard the gunshots, and went over to where Yanetta lay. Jones took two cell phones from Yanetta's person and subsequently deleted files from them. The phones were turned over to the police several days later.

{¶20} Detective Diaz testified that the phones had pictures of Yanetta holding guns and stacks of money. One phone also had a picture of a docket belonging to a court case Williams had along with a witness list from the case.

{¶21} Further, Detective Diaz testified about a woman who appeared on a police body camera saying that the shooter was a black male wearing a grey "hoodie." The defense objected and requested a mistrial; the court sustained the objection on hearsay grounds, but denied the request for a mistrial. The court instructed the jury, "I sustained that last objection, and the statement made by the detective is to be disregarded by you."

**Williams's Case**

{¶22} After the state rested its case, Williams made a Crim.R. 29 motion for judgment of acquittal, that the trial court denied. Williams called one witness, Frances Williams, his cousin. She testified that on the night in question Williams was supposed to have attended a birthday party at another bar. She received calls from Williams to come pick him up from "somewhere on the west side" at 12:26 a.m.

{¶23} After presenting his witness, Williams renewed his Crim.R. 29 motion, that

the trial court again denied.

**Jury's Verdict and Court's Sentence**

{¶24} On the above-mentioned testimony, the jury found Williams guilty of all counts except Count 4, the attempted murder of Schilling. The trial court merged Counts 1 through 3 (and the one-and three-year firearm specifications) for the purposes of sentencing (aggravated murder, murder, and felonious assault, respectively, of Yanetta).

{¶25} The state elected to proceed on Count 1, aggravated murder, with the three-year firearm specification. The trial court sentenced Williams to 25 years to life on the aggravated murder conviction, consecutive to three years for the firearm specification. The court sentenced Williams to four years on Count 5, the felonious assault of Schilling, consecutive to three years on the firearm specification. Counts 1 and 5 were ordered to be served consecutive. Further, Williams was sentenced to 36 months on Count 6, having weapons while under a disability, and Count 6 was ordered to be served concurrent to the sentence on the other counts. Thus, the trial court sentenced Williams to an aggregate prison term of 35 years to life.

{¶26} This appeal ensues, with Williams raising the following three assignments of error for our review:

> I. The trial court erred in allowing the state to elicit hearsay statements and the cumulative effect of these statements denied appellant's right to a fair trial.

> II. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the charge is not supported by sufficient evidence.

III. Appellant's convictions were against the manifest weight of the evidence.

## II. Law and Analysis

**Hearsay Testimony**

{¶27} At trial, Detective Diaz, the investigating detective, testified about a woman who appeared on a police body camera saying that the shooter was a black male wearing a grey "hoodie." The defense objected and requested a mistrial; the court sustained the objection on hearsay grounds, but denied the request for a mistrial. The court instructed the jury, "I sustained that last objection, and the statement made by the detective is to be disregarded by you." In his first assignment of error, Williams contends that the "cumulative effect of these statements prevented Appellant from receiving a fair trial."

{¶28} We first note that Williams has invoked the cumulative effect doctrine, but complains about only one hearsay statement. The cumulative effect doctrine contemplates multiple errors, however: "Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. The cumulative effect doctrine is not applicable here.

{¶29} We next note that the trial court sustained the objection and curatively

instructed the jury to disregard Detective Diaz's testimony on that point. Curative instructions are presumed to be an effective way to remedy errors that occur during trial, and the jury is presumed to follow any such instructions. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

**{¶30}** In light of the above, we find no abuse of the trial court's decision to deny the defense's request for a mistrial.[2] A mistrial is an extreme remedy that is only warranted in circumstances where a fair trial is no longer possible and mistrial is required to meet the ends of justice. *State v. Jones*, 83 Ohio App.3d 723, 737, 615 N.E.2d 713 (2d Dist.1992). A mistrial should not be ordered in a criminal case "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Lukens*, 66 Ohio App.3d 794, 809, 586 N.E.2d 1099 (10th Dist.1990).

**{¶31}** Upon review, we find no showing that Williams suffered any prejudice or that his substantial rights were affected as a result of the hearsay statement. We note, in particular, that what Williams was wearing at the time in question was only a small part of the evidence against him; other, overwhelming evidence, as will be discussed below, was presented against Williams.

**{¶32}** Thus, there is no merit to the first assignment of error and it is overruled.

---

[2]The grant or denial of a motion for a mistrial rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). A reviewing court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice. *Id.*

**Sufficiency of the Evidence**

{¶33} Williams was charged with aggravated murder under R.C. 2903.01(A), which provides in pertinent part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." In his second assignment of error, Williams contends that the evidence was insufficient to sustain the "prior calculation and design" element of the aggravated murder conviction.

{¶34} In determining whether a conviction is supported by sufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶35} "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). Evidence of purpose, however, does not automatically mean that the element of prior calculation and design also exists. *State v. Campbell*, 90 Ohio St.3d 320, 341, 738 N.E.2d 1178 (2000) ("purpose to kill is not the same thing as prior calculation and design and does not by itself satisfy the mens rea element of R.C. 2903.01(A)"). Rather, for the evidence to be sufficient to support aggravated murder, there has to be some evidence of premeditation or a plan ahead of time to purposely kill someone.

{¶36} The Ohio Supreme Court has emphasized that there is "no bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 148; *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61; *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997).

{¶37} During trial, the state played the relevant portions of the video from the bar's surveillance camera for the jury. The video shows that Williams came to the bar sometime between 1:20 a.m. and 1:30 a.m. He is captured on the video dancing, singing, and talking with patrons — apparently having a good time. Yanetta came into the bar at approximately 2:24 a.m. Williams is shown on the video looking in the direction of Yanetta as he enters the bar.

{¶38} The state argued to the jury that Williams noticed Yanetta and that Williams's demeanor "completely flipped" upon seeing him. The video shows Williams looking in Yanetta's direction as Yanetta entered the bar. Williams, who had been dancing, stopped dancing, whispered into an unknown person's ear and then immediately left the bar and never returned. The shooting then occurred moments after Yanetta left the bar at approximately 2:35 a.m.

{¶39} This evidence was sufficient to sustain the element of "prior calculation and design." The evidence demonstrated a remarkable change in Williams's demeanor upon seeing Yanetta, followed by his rapid departure from the bar upon seeing Yanetta, and his

"lying in wait" for him after apparently retrieving a gun. The trial testimony also demonstrated that Yanetta and Williams knew each other, as evidenced by a picture on Yanetta's phone of the docket from a court case of Williams's, along with a witness list from that case.

{¶40} In light of the above, the second assignment of error is overruled.

**Manifest Weight of the Evidence**

{¶41} Williams's final assignment of error challenges his conviction based on the weight of the evidence.

{¶42} A manifest weight challenge concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. *State v. Carroll*, 12th Dist. Clermont Nos. CA2007-02-030 and CA2007-03-041, 2007-Ohio-7075, ¶ 118. An appellate court considering whether a conviction was against the manifest weight of the evidence must review the entire record, weighing the evidence and all reasonable inferences, and consider the credibility of witnesses. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 39. The weight of the evidence and credibility of witnesses, however, are matters primarily for the finder of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Under a manifest weight challenge, the question is whether, in resolving conflicts in the evidence the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Id.*

{¶43} Williams primarily contends that all reasonable inferences in this case

demonstrate that he was acting in self-defense. We disagree. Williams did not pursue a self-defense strategy at trial — no request for a self-defense instruction was made, and no such instruction was given to the jury. Simply, the evidence would not have supported a self-defense instruction.

{¶44} In reviewing the entire record and weighing the evidence and reasonable inferences, this is not a case where the jury clearly lost its way. It is true, as Williams points out, that there was no eyewitness testimony to the actual shooting, but there was an overwhelming amount of scientific, as well as circumstantial, evidence tying Williams to the shooting. That evidence included: Williams running away from the scene of the shooting with a firearm in his hand; the murder weapon being recovered near where Williams was found; the murder weapon containing a single source of DNA, that being Williams's DNA; and the pellet recovered from Yanetta's body determined to have come from that weapon found near Williams.

{¶45} In light of the above, Williams's contention that his conviction was against the manifest weight of the evidence is without merit. The third assignment of error is overruled.

{¶46} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

SEAN C. GALLAGHER, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR