[Cite as *State v. Hatcher*, 2025-Ohio-5762.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                                    :               No. 115055

DAIVON HATCHER,                    :

    Defendant-Appellant.      :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 24, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-685611-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Jeffrey Maver, Assistant Prosecuting Attorney, *for appellee*.

Daniel J. Misiewicz, *for appellant*.

WILLIAM A. KLATT, J.:

{¶ 1} Defendant-appellant Daivon Hatcher ("Hatcher") appeals from his convictions and sentencing following a bench trial. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} This case arose from Hatcher's alleged involvement with the shooting and subsequent death of Arriona Days ("Days") on September 9, 2023. On October 12, 2023, a grand jury indicted Hatcher on five counts: Count 1, aggravated murder, in violation of R.C. 2903.01(A); Count 2, murder, in violation of R.C. 2903.02(A); Count 3, murder, in violation of R.C. 2903.02(B); Count 4, felonious assault, in violation of R.C. 2903.11(A)(1); and Count 5, felonious assault, in violation of R.C. 2903.11(A)(2). All five counts carried one- and three-year firearm specifications. Hatcher pleaded not guilty to the charges on October 16, 2023.

{¶ 3} On February 26, 2025, Hatcher waived his right to a jury trial, executed a jury waiver, and proceeded to a bench trial. The State introduced trial testimony from Dearmonte Campbell ("Campbell"), Tanner Greer ("Greer"), Nicholas McGee ("McGee"), Officer Khristian Vaden ("Officer Vaden"), Detective Eric Strick ("Detective Strick"), Detective Erin O'Donnell ("Detective O'Donnell"), Detective Mike Asbury ("Detective Asbury"), and Dr. Kaitlin Weaver ("Dr. Weaver").

**A. Dearmonte Campbell**

{¶ 4} Campbell testified that he regularly purchased marijuana from his friend, Days, and testified that the following events took place on September 9, 2023. Campbell and Days agreed to meet at Days's grandmother's house ("the grandmother's house") located at 4183 East 154th Street in Cleveland, Ohio, so that Campbell could purchase marijuana from Days. Campbell's cousin drove Campbell to the grandmother's house; his cousin's girlfriend was also in the vehicle. The

cousin parked the vehicle on the street and, while waiting for Days to arrive, Campbell exited the car and walked to the back of the grandmother's house to urinate in the backyard. After relieving himself, Campbell turned around to head back to the parked car and unexpectedly observed a person wearing a black mask and black gloves ("masked individual"), who was crouched down near the back of the grandmother's house, between a trash can and a parked vehicle. Campbell stated the masked individual was taller than him — Campbell is five feet seven inches — but he could not discern the person's skin color. The masked individual did not respond when Campbell attempted to speak with him. Campbell found the individual's presence "weird," and Campbell chose not to return to his cousin's vehicle but to stand on the grass near the driveway until Days arrived.

{¶ 5} Days arrived at the grandmother's house a few minutes later; Days was in the driver's seat and a front seat passenger had the passenger seat fully reclined. Days reversed her vehicle into the driveway. Campbell approached the front driver's side window to speak with Days, and the masked individual ran to the vehicle, discharged a firearm at Days, turned around, and faced Campbell. Campbell felt threatened by the masked individual, so Campbell punched him in the face. The two individuals "got to wrestling and tussling" with one another for a few minutes before Campbell ran to his cousin's vehicle and left the scene because he feared for his life. Tr. 84.

{¶ 6} Campbell initially testified that while he and the masked individual wrestled, a phone fell from the masked individual's pocket and landed on the

ground. Under cross-examination, Campbell stated that he was not certain the masked individual dropped a cell phone during the scuffle:

> DEFENSE COUNSEL: I am going to ask you another question. I don't want to hear what anybody said. So you are not sure what that person dropped; would that be fair?
>
> CAMPBELL: It had to be a phone.
>
> DEFENSE COUNSEL: Well, you just testified you weren't sure it was a phone, it might not have been a phone, it could have been something else. And you just agreed with me on that. So you don't know what it was; could we at least agree on that?
>
> CAMPBELL: Honestly, it had to be —
>
> DEFENSE COUNSEL: Yes or no.
>
> CAMPBELL: Yes.

Tr. 95.

{¶ 7} Campbell did not see the masked individual leave the scene. Campbell returned later to the grandmother's house and provided a statement to the police. The police tested Campbell's hands and hoodie for DNA.

**B. Tanner Greer**

{¶ 8} Greer, one of Days's best friends, was the front seat passenger in Days's vehicle on the day of the shooting. Greer testified that he was reclined in the front seat and asleep when they arrived at the grandmother's house and he woke up when gunshots were fired and Days yelled that she had been shot. Greer testified that he told Days to leave the scene and, at the same time, he observed two individuals outside the car wrestling a third person to the ground. According to

Greer, the person on the ground stood up and ran away, and the other two individuals left in a vehicle that had been parked on the street. Greer could not identify the three individuals. Greer further testified that he and Days had been up the previous night drinking and "so [he] was, you know, a little not there for real." Tr. 192.

{¶ 9} Greer stated that after Days was shot, she drove her vehicle out of her grandmother's driveway and ran into the telephone pole across the street. Greer testified that he exited the vehicle and started to run away until he realized no one else was present and he was not in jeopardy of being shot. Greer further testified that he then called 911 and Days's cousin to report the shooting. According to Greer, before the police arrived, he recovered a mobile phone in front of the grandmother's house in the same area where he observed the individuals wrestling. Greer testified that he asked family members and neighbors who were present — before the police arrived — whether the phone belonged to them, and they all said no. Greer stated that he eventually gave the phone to Days's cousin.

## C. Officer Khristian Vaden

{¶ 10} At 1:41 p.m. on September 9, 2023, Officer Vaden, a patrol officer with the Cleveland Division of Police, responded to the crime scene. This was Officer Vaden's first homicide assignment. Officer Vaden activated her body camera while at the scene, and portions of the recorded footage were played at trial. Officer Vaden interviewed Greer at the crime scene, and his statements were consistent with his trial testimony.

{¶ 11} Officer Vaden testified that she overheard Days's family members at the crime scene discussing a mobile phone that had been left by the shooter and was then in the possession of a family member who was at the hospital with Days. Officer Vaden testified that at her request, the mobile phone was returned to her at the crime scene by an unidentified female; the phone was then marked and tagged as evidence ("crime scene phone"). At trial, Hatcher stipulated that he was the owner of the crime scene phone.

{¶ 12} Officer Vaden stated that she prepared a report that was submitted to the homicide detective assigned to Days's shooting and she had no further involvement with the case.

## D. Detective Erin O'Donnell

{¶ 13} Detective O'Donnell, the primary homicide detective on the case, testified about the investigation. She testified that because Campbell fought with the shooter, she obtained Campbell's clothing for DNA analysis. No DNA evidence was introduced at trial. Detective O'Donnell stated she canvassed the neighborhood for surveillance cameras and obtained video evidence from a nearby school that showed a person fleeing in dark clothing, but the person could not be identified from the video recording.

{¶ 14} Detective O'Donnell testified that the alleged shooter dropped his mobile phone and left it at the crime scene. Detective O'Donnell stated that the phone was not recovered at the crime scene by the police but provided to the police by Days's cousin; Detective O'Donnell did not know how long the cousin had

possession of the phone before it was turned over to the police. Detective O'Donnell further stated that the screen saver on the mobile phone was a photograph of a male and the screen depicted several missed calls from someone identified as Tae Blow 3. According to Detective O'Donnell, another detective took a photograph of the crime scene phone's screen saver and forwarded that to the police department's fusion unit. Detective O'Donnell stated that the fusion unit, which runs pictures through social media, BMV records, arrest records, and other databases to attempt to identify a person, identified Hatcher as the individual depicted on the crime scene phone's screen saver.

{¶ 15} Detective O'Donnell further stated that once Hatcher was identified, she conferred with the gang impact unit that designated Hatcher and Keauntae Stradford ("Stradford"), who was also known as Tae Blow, as persons of interest. As part of the ongoing investigation, Detective O'Donnell interviewed Stradford on September 20, 2023, and the detective interviewed Hatcher's girlfriend because she was Hatcher's alibi for the date of the shooting.

{¶ 16} Detective O'Donnell arrested Hatcher on October 5, 2023, at his mother's home in Bedford, Ohio. In conjunction with Hatcher's arrest, the officers searched the house and discovered two cell phones, one of which belonged to Hatcher ("search warrant phone").[1] Detective O'Donnell forwarded Hatcher's crime

---

[1] At trial, Hatcher stipulated to his ownership of the search warrant phone.

scene phone and Hatcher's search warrant phone to the Secret Service who successfully unlocked the phones and extracted relevant information from them.

{¶ 17} Detective O'Donnell testified about text messages between Hatcher and a contact called "Waun" that were extracted from the crime scene phone.[2] The messages were sent on September 8, 2023, the day before Days's shooting, and read verbatim:

> Hatcher: Here's I come
> Waun: Still at work
> Hatcher: Ik [sic] it's to[o] hot to do that today[3]
> Hatcher: That's all I was finna [sic] tell you
> Waun: Ight [sic]

State's exhibit No. 177. Waun's last text message was followed by an attachment. The attachment is a Cleveland Remembrance post that depicts Days's grandmother's street with a caption that reads, "Police plan increased patrols after violent few days in Euclid." State's exhibit No. 177A. Following the attachment, Hatcher and Waun sent the following text messages:

> Hatcher: Yea it's tight rn [sic]
> Waun: Aye I got to work at 6:30 and don't get of[f] till 3 so let me know Wasssup[4] [sic]

State's exhibit No. 177.

---

[2] The text messages obtained from the extraction report and admitted as State's exhibit No. 177 indicate the messages are between "Vonny Kash (owner)" and "Waun." Because Hatcher stipulated to his ownership of the crime scene phone, we reference Hatcher, rather than "Vonny Kash(owner)," as the writer of the messages.

[3] Detective O'Donnell surmised "Ik" means "I know."

[4] Detective O'Donnell did not testify about the text messages sent after the attachment.

{¶ 18} Detective O'Donnell testified that she found the text messages and attachment indicative of a plan to shoot Days: "I took it as an understanding that maybe they were planning on shooting [Days] on the 8th, but because of the police increased patrol, that it wasn't a good idea." Tr. 225. Detective O'Donnell conceded that she could not state if the text was simply referring to the outside temperature as being "too hot" or if the message held some other meaning.

{¶ 19} Detective O'Donnell also testified that the extraction report on the search warrant phone revealed that on September 20, 2023 — the day the police interviewed Stradford — Hatcher searched the term "felonious assault" and conducted numerous searches on the Cuyahoga County court docket. Detective O'Donnell speculated that after the police interviewed Stradford, Stradford shared the details of the interview with Hatcher and, in response, Hatcher searched the Cuyahoga County court docket.

### E. Detective Mike Asbury

{¶ 20} Detective Asbury, a member of the Rocky River Police Department, assisted the prosecutor's office with analyzing the extraction reports generated from the crime scene phone and search warrant phone. Detective Asbury explained that the extraction reports indicated the crime scene phone could be opened or accessed either by passcode or facial recognition. Further, the extraction reports identified any device event that occurred, including when the crime scene phone was powered on or off or unlocked or when the camera was initiated.

{¶ 21} Detective Asbury stated that he reviewed the device events around the time of the homicide and created location records and call frequency charts based upon those materials. According to Detective Asbury, the call frequency chart reflected that between August 13, 2023, and September 9, 2023, approximately 482 calls were made between Hatcher and Tae Blow 3, and between September 6, 2023, and September 9, 2023, 149 phone calls, including FaceTime calls, were made between the two contacts. Detective Asbury testified that the location records indicated the crime scene phone had been in the neighborhood of the grandmother's house around the time of the shooting.

{¶ 22} Detective Asbury testified that on September 8, 2023, the day before the shooting, a group phone call was conducted on the crime scene phone that included Tae Blow 3 and lasted about 20 minutes.

{¶ 23} Detective Asbury testified that the extraction reports showed a number of calls to and from the crime scene phone on September 9, 2023 — the day of the shooting. The individual possessing the crime scene phone answered the phone, using FaceTime, at 1:12 p.m. and conducted a call with Tae Blow 3 for two minutes and 17 seconds. At 1:15 p.m., the phone was unlocked and a tenth of a second later, the camera was engaged, which indicated the possessor of the phone unlocked the phone using facial recognition mode. At 1:27 p.m., the crime scene phone was unlocked again and, in response to a text message from an unknown sender that reads, "Hold on I'm in the car," the possessor of the phone answered

with a "liked" or "loved" emoji. Tae Blow 3 made four calls to Hatcher's crime scene phone — at 1:39 p.m., 1:40 p.m., 1:41 p.m., and 1:52 p.m. — that were unanswered.

{¶ 24} Detective Asbury stated it is possible to have more than one facial recognition ID on a phone.

**F. Dr. Kaitlin Weaver**

{¶ 25} Dr. Weaver, the deputy medical examiner with the Cuyahoga County Medical Examiner's Office, performed an autopsy on Days and testified to the following to a reasonable degree of scientific certainty. Dr. Weaver testified that gunshot wounds to Days's chest, right upper extremity, and left lower extremity caused her death. Dr. Weaver further testified that the chest and left lower extremity wounds were consistent with gunshots discharged from the left side of her body. Additionally, the gunshot wound to Days's right arm was consistent with a firearm discharged from her left side because her right arm could have been "moving in space" when struck by a bullet. Dr. Weaver ruled the manner of death was a homicide.

**G. Nicholas McGee**

{¶ 26} McGee agreed to testify on behalf of the State against Hatcher and against another defendant in an unrelated case in return for a plea deal on McGee's pending criminal charges. Without the plea deal, McGee could have been sentenced up to 44 and one-half years on charges that included criminal gang activity, drug trafficking, receiving stolen property, having weapons while under disability, and aggravated burglary. Under the plea agreement, McGee agreed to plead to 21 felony

charges, ranging from felonies of the third degree to felonies of the fifth degree, and he would not be subject to mandatory prison time.

{¶ 27} McGee testified that he and Hatcher were close friends for approximately ten years, having grown up in the same neighborhood. McGee stated that he decided to testify against Hatcher to ensure the person responsible for Days's death was imprisoned and thereby provide relief to Days's family. McGee further stated that Hatcher, who he called Vonny, shot and killed Days.

{¶ 28} McGee stated that about two weeks before the shooting, he engaged in a conversation with Day Day, an older individual from the neighborhood, who was willing to pay $10,000 to 15,000 to anyone who would kill Days because Day Day blamed her for a prior robbery that caused Day Day to lose an eye. The conversation allegedly occurred in a barbershop, when only Day Day, the barber, and McGee were present. According to McGee, Day Day originally wanted Stradford to kill Days but Stradford was unable to perform the hit because he is legally blind after also losing an eye. McGee stated that in lieu of Stradford, Day Day wanted either McGee or Hatcher to kill Days.

{¶ 29} McGee stated that following the discussion in the barbershop, McGee spoke with Stradford and Hatcher about the "hit" on Days. McGee further stated that Stradford wanted the reward money, Hatcher needed the money, and McGee declined to kill Days because he did not know her personally, he had no problems with her, and he did not need the money. McGee testified that he did not know prior to September 9, 2023, that Hatcher planned to kill Days.

{¶ 30} McGee testified that on the day of the shooting and after the event occurred, he called Stradford, his close friend who goes by the nickname Tae Blow, to learn more about the shooting. McGee and Stradford are codefendants in a pending criminal action with gang charges. McGee testified that Stradford initially hung up and then called him back, approximately ten minutes later; Stradford and Hatcher were on the phone and proceeded to talk with McGee. During the call, Hatcher informed McGee that he had shot Days, he had dropped his mobile phone and weapon at the crime scene, and he had run from the crime scene to a house where Stradford was located. McGee stated that Hatcher sounded nervous — because he realized his phone had been recovered at the crime scene — but also prideful because he had killed Days who had a price on her head. McGee testified that Hatcher stated, "I just did that, I just did that, ooh." Tr. 150. According to McGee, as Hatcher recounted the events of the shooting, Stradford could be heard in the background calling Hatcher "dumb" and "stupid" because Hatcher left his mobile phone behind at the crime scene.

{¶ 31} Per McGee, Hatcher told him during the phone conversation that the following events occurred. Hatcher was dressed in a black hoodie and black jogging pants with zippered pockets. Hatcher went to the home of one of his family members who lives in the same neighborhood as Days's grandmother and walked to the grandmother's house from there. Hatcher called back and forth with Stradford and "waited at [Days's] little spot that she park[ed at] to serve her weed." Tr. 148. While waiting for Days to arrive, another individual came to the house and walked

into the backyard to urinate. That individual spoke with Hatcher, and Hatcher replied that he was waiting for Days. Upon Days's arrival at the house, the other individual approached her vehicle first and then Hatcher walked to the car and shot Days. The other individual tackled Hatcher, causing his gun and phone to fall, although Hatcher did not know at the crime scene that he lost his mobile phone. Hatcher stood up, was shot at, ran to an abandoned house where he discarded his hoodie, and met Stradford at a house.

{¶ 32} McGee stated that after his phone call with Stradford and Hatcher, he drove by the crime scene and observed the police, EMS, and coroner. McGee stated he called Stradford back and said "[D]ang, like that really happened" and Stradford responded "[Y]eah." Tr. 152.

{¶ 33} McGee stated that about two weeks after the shooting, he saw several friends, including Hatcher, at a party. McGee further stated that Hatcher again described in detail how he shot Days, and Hatcher stated he had purchased a new phone since the shooting. McGee also testified that Hatcher told him that on the day of the shooting, Hatcher called Stradford several times from the grandmother's house, while waiting for Days's arrival, and Stradford told him when Days would arrive. McGee further testified that the crime scene phone had a picture of Stradford, Hatcher, Frank, and McGee, and it was through that picture that Days's family members determined that Hatcher was involved in the shooting.

{¶ 34} Per McGee, Day Day was concerned that the police would identify Hatcher as the shooter because Hatcher's mobile phone was recovered at the crime

scene and Day Day was also worried that Hatcher would turn him into the police. As a result, Day Day paid Hatcher, through Stradford, $4,000 for killing Days. Further, McGee testified that Day Day "went ghost" and disappeared because he was concerned he would be associated with the killing.

{¶ 35} Later in October 2023, McGee and Hatcher were both arrested on separate charges and assigned to the same pod in county jail while awaiting their respective cases. McGee testified that while in jail, Hatcher informed him that he would prevail at a bench trial because he was masked at the time of the shooting, the only evidence against him was his mobile phone, and his girlfriend was going to testify that she was with him the day of the shooting.

**H. Verdict and Sentencing**

{¶ 36} After the State presented its case-in-chief, Hatcher requested a Crim.R. 29 motion that the trial court denied. After the defense rested without introducing any additional evidence, Hatcher presented a renewed Crim.R. 29 motion that was again denied. After considering the stipulated facts, exhibits, direct evidence, and circumstantial testimony, the trial court stated that it found the State's witnesses credible. The court further found Hatcher guilty on all counts and specifications, and the court referred Hatcher for a presentence investigation and report.

{¶ 37} The trial court conducted a sentencing hearing on March 24, 2025. For purposes of sentencing, the court merged Counts 2, 3, 4, and 5 with Count 1, aggravated murder. The trial court heard victim-impact statements from Days's

mother, aunt, and cousin. The court then sentenced Hatcher to six years' mandatory prison time on Count 1's and Count 2's three-year firearm specifications to be served prior to and consecutively with a life sentence, on Count 1, with the possibility of parole eligibility after serving 31 years of imprisonment.

{¶ 38} On April 24, 2025, Hatcher filed a notice of appeal, and he now presents two assignments of error:

> Assignment of Error I: The verdicts were against the manifest weight of the evidence.

> Assignment of Error II: The verdicts were not supported by sufficient evidence.

**Legal Analysis**

{¶ 39} Initially, we note that in his assignments of error, Hatcher challenges the weight of the evidence and the sufficiency of the evidence supporting his convictions in Counts 1 through 5. For sentencing purposes, Counts 2, 3, 4, and 5 merged into Count 1, and the court proceeded with sentencing on Count 1, aggravated murder, in violation of R.C. 2903.01(A). This court has previously found that with merged offenses, if there is sufficient evidence to support the offense upon which the State elected to have the defendant sentenced, the reviewing court need not consider the sufficiency of the evidence or manifest weight of the evidence on the merged counts because any error would constitute harmless error. *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990), and *Ramos* at ¶ 15, citing *State v. Worley*, 2016-Ohio-2722, ¶ 23 (8th Dist.). Thus, pursuant to *Ramos*, we will only consider Count 1, aggravated murder,

in our evaluation of the sufficiency of the evidence and the manifest weight of the evidence arguments.

## A. Sufficiency of the Evidence

{¶ 40} For ease of discussion, we will address the assignments of error out of order. In his second assignment of error, Hatcher contends that the trial court's verdict was based on insufficient evidence.

{¶ 41} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the State has met its burden of production at trial is conducted. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 33. An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at ¶ 36. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at ¶ 23.

{¶ 42} In a sufficiency inquiry, we also assume the State's witnesses testified truthfully and evaluate whether that testimony, along with any other evidence introduced at trial, satisfies each element of the offense. *In re D.R.S.*, 2016-Ohio-

3262, ¶ 23 (8th Dist.). The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g., State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). Circumstantial evidence and direct evidence "'possess the same probative value.'" *State v. Peterson*, 2024-Ohio-2903, ¶ 14 (8th Dist.), quoting *Jenks* at 272.

{¶ 43} "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *Wells* at ¶ 25, quoting *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

{¶ 44} Circumstantial evidence is "evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Wells* at ¶ 25, quoting *Cassano* at ¶ 13; *See also State v. Hartman*, 2008-Ohio-3683, ¶ 37 (8th Dist.) ("[C]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."). Circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime. *In re A.W.*, 2016-Ohio-7297, ¶ 28 (8th Dist.), citing *State v. Lawwill*, 2008-Ohio-3592, ¶ 11 (12th Dist.). And "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155 (1988).

{¶ 45} While there was no direct evidence such as witnesses or conclusive DNA evidence linking Hatcher to the victim's murder, our review of the trial

transcript indicates that the State produced sufficient circumstantial evidence to support the convictions.

**1. Purposely Caused Days's Death**

{¶ 46} Hatcher was convicted of aggravated murder pursuant to R.C. 2903.01(A), which requires the State to prove Hatcher caused Days's death "purposely, and with prior calculation and design." A person acts purposely when it is his specific intent to cause a certain result. R.C. 2901.22(A).

{¶ 47} McGee testified that Day Day put a "hit" out on Days, and he wanted either Hatcher or McGee to perform the killing. McGee further testified that he discussed the "hit" with Hatcher and Stradford, and Hatcher indicated he needed the money Day Day would pay for killing Days.

{¶ 48} McGee stated that Hatcher admitted on September 9, 2023, during a phone call between McGee, Stradford, and Hatcher, that Hatcher had dressed in black, waited at the grandmother's house for Days's arrival, and shot Days. McGee also testified that Hatcher stated, "I just did that, I just did that, ooh."

{¶ 49} McGee also testified that when he and Hatcher spoke at a party two weeks after the shooting and when they were both housed in the same pod in the county jail, Hatcher again told McGee he shot Days.

{¶ 50} Dr. Weaver testified that Days died because of gunshot wounds and classified her death as a homicide. Dr. Weaver further testified that the gunshot wounds were consistent with the shooter discharging the firearm at the driver's side

of Days's vehicle. Greer, Campbell, and McGee all stated the firearm was discharged at the driver's side of Days's vehicle.

{¶ 51} The evidence supports a conclusion that it was Hatcher's specific intent to purposely cause the death of Days.

**2. Prior Calculation and Design**

{¶ 52} There is no bright-line rule to establish the existence of prior calculation and design; rather, the presence or absence of this element is determined on a case-by-case analysis of the facts and the evidence. *State v. Shine*, 2018-Ohio-1972, ¶ 149 (8th Dist.), citing *State v. Walker*, 2016-Ohio-8295, ¶ 19. The facts of a particular case can demonstrate that the defendant had adopted a plan to kill. *State v. Conway*, 2006-Ohio-791, ¶ 46. "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.'" *State v. McFarland*, 2020-Ohio-3343, ¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978).

{¶ 53} The following may serve as circumstantial evidence to demonstrate a defendant acted with prior calculation and design:

> (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer the defendant had a preconceived notion to kill regardless of how the [crime] unfolded, or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill.

*State v. Orr*, 2014-Ohio-4680, ¶ 75 (8th Dist.), citing *State v. Dunford*, 2010-Ohio-1272, ¶ 53 (11th Dist.), citing *State v. Trewartha*, 2005-Ohio-5697 (10th Dist.); *see State v. Williams*, 2018-Ohio-3792, ¶ 39 (8th Dist.).

{¶ 54} Further, the Ohio Supreme Court in *Walker* specified three factors a court should consider when determining whether a defendant acted with prior calculation and design:

> (1) Did the accused and victim know each other, and if so, was that relationship strained; (2) Did the accused give thought or preparation to choosing the murder weapon or murder site; and (3) Was the act drawn out or "an almost spontaneous eruption of events?"

*Orr* at ¶ 78, quoting *State v. Taylor*, 1997-Ohio-243, ¶ 19, citing *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976). A court should weigh the *Walker* factors with the totality of the circumstances surrounding the murder. *Orr*, citing *Jenkins*.

{¶ 55} McGee testified that Day Day contacted Hatcher and himself, separately, prior to the shooting and informed them that he wanted to have Days killed — because she caused him to lose an eye — and he would pay the shooter $10,000 to $15,000. McGee also testified that Day Day wanted either Hatcher or McGee to perform the "hit" on Days. McGee testified that he spoke about Day Day's proposed "hit" with Stradford and Hatcher, and Hatcher indicated he needed the money offered by Day Day.

{¶ 56} Hatcher's text message with Wuan on September 8, 2023, in which Hatcher stated, "[I]t was too hot," and the related attachment that referenced the increased police presence in the area suggest that Hatcher abandoned a plan to

attempt to kill Days on September 8, 2023. The testimony demonstrated that on September 9, 2023, the shooter was dressed in black, including a black mask that hid his identity, and was crouched down in the back of the grandmother's house waiting for Days's arrival. During the shooter's chance meeting with Campbell, the shooter did not speak with Campbell and did not reveal his identity or purpose for being at the grandmother's house. According to Campbell, the shooter was armed and upon Days's arrival, he immediately shot at her without hesitation. Based upon McGee's testimony and the evidence related to the crime scene phone, the trier of fact could find that the shooter was Hatcher.

{¶ 57} The evidence satisfied two of the *Walker* factors — the accused knew the victim and the accused gave thought or preparation to choosing the murder weapon or murder site — indicating the existence of Hatcher's prior calculation and design. Based upon the conversation between Day Day and Hatcher, when Hatcher learned that Day Day would pay a reward for the death of Days, and the subsequent conversation between Hatcher, Stradford, and McGee, when the three friends discussed Day Day's proposal to pay for the death of Days, the court could find that Hatcher was familiar with Days prior to the date of the shooting. Additionally, Hatcher gave thought to the murder weapon and murder site. According to McGee's testimony, Hatcher hid near where Days often parked her vehicle and conducted her drug sales. Campbell corroborated this was the location of the shooter. Hatcher was armed with a firearm and waited for Days's arrival. While the shooting was not drawn out, construing the evidence in a light most favorable to the prosecution, any

rational trier of fact could have concluded beyond a reasonable doubt that Hatcher had formulated a plan to kill Days.

{¶ 58} We note that Hatcher argues there was no clear description of the suspect, it is unclear how the crime scene phone was discovered, the phone's whereabouts before it was turned over to the police are unknown, and Campbell's and Greer's testimony was inconsistent.

{¶ 59} The inconsistencies in Campbell's and McGee's statements — that related to whether Hatcher spoke with Campbell in the back of the grandmother's house and whether someone fired gunshots at the shooter as he ran from the crime scene — are minor and do not refute the trial court's finding of sufficient evidence that Hatcher was the shooter and guilty of aggravated murder.

{¶ 60} As to the crime scene phone, Campbell testified that something fell from the shooter's pocket when he and the shooter wrestled, and Greer testified that he picked up the crime scene phone from that same area. Officer Vaden stated she was handed the crime scene phone by Days's cousin. The mobile phone extraction reports placed the crime scene phone in the vicinity of the grandmother's house. Testimony from Detective Asbury indicated Hatcher accessed the crime scene phone by facial recognition ID at 1:15 p.m. on the day of the shooting, indicating Hatcher possessed the phone within 25 minutes of when the police were dispatched to the crime scene. Nothing in the record demonstrates the crime scene phone was mishandled, and Hatcher stipulated that he owned the phone.

**{¶ 61}** No witness identified Hatcher as the shooter, but McGee testified that Hatcher confessed on three separate occasions that he killed Days.

**{¶ 62}** This evidence was sufficient to establish that Hatcher acted purposely, and with prior calculation and design, when he shot and killed Days and, accordingly, we overrule Hatcher's second assignment of error.

## B. Manifest Weight of the Evidence

**{¶ 63}** In his first assignment of error, Hatcher contends that the trial court's verdict was against the manifest weight of the evidence because the evidence did not demonstrate that he was the shooter.

**{¶ 64}** A manifest weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins*, 1997-Ohio-52 at ¶ 24; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at ¶ 33.

**{¶ 65}** In our manifest-weight review of a bench trial verdict, we recognize that the trial court, rather than a jury, is serving as the factfinder:

> Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*State v. Bell*, 2019-Ohio-340, ¶ 41 (8th Dist.), citing *State v. Strickland*, 2009-Ohio-3906, ¶ 25 (8th Dist.); *see also State v. Kessler*, 2010-Ohio-2094, ¶ 13 (8th Dist.).

{¶ 66} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at ¶ 25, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus.

{¶ 67} Here, Hatcher contends that the crime scene phone should be afforded "limited weight" because the evidence did not clearly establish the phone's initial whereabouts and how it came into the police department's possession. Hatcher also contends that Detective O'Donnell, Campbell, and Greer provided inconsistent testimony and McGee's testimony should be viewed with suspicion because he testified in exchange for a plea deal.

{¶ 68} As to the crime scene phone, Hatcher does not question the chain of custody of the phone once it was received by the police, but argues "the phone's initial whereabouts and how it came to the police are in question" and, therefore, this adversely impacted the weight of the evidence. Appellant's brief, p. 9.

{¶ 69} The phone was temporarily removed from the crime scene, but Greer stated he picked the phone up where the shooter and Campbell wrestled, and Officer Vader testified to her receipt of the phone. The testimony of Detective Asbury demonstrated the phone's presence in the neighborhood of the grandmother's house at the time of the shooting. Further Detective Asbury stated that, based upon the

exclusion report, the crime scene phone was opened by facial recognition ID within 25 minutes of the police responding to the crime scene. And Hatcher stipulated that the crime scene phone belonged to him. Temporarily removing the phone from the crime scene does not discredit the additional evidence that the phone, which belonged to Hatcher, was present and in use at the crime scene around the time of the shooting.

{¶ 70} As stated above, there were inconsistencies between Campbell's and McGee's testimony. There was also an inconsistency between Campbell's and Greer's testimony. Campbell stated he was the only person to physically engage with the shooter yet Greer testified that when he woke up and saw people outside Days's vehicle, he saw two people wrestle with the shooter before the shooter ran away. Hatcher also questions the testimony of Detective O'Donnell who stated that after the fusion unit identified Hatcher as the individual whose picture was on the crime scene phone, she conferred with the prosecutor's office and noted that Hatcher matched the physical description of the male shooter. The only physical description of the shooter that Campbell provided was that the shooter was between five foot nine inches and six feet two inches. Detective O'Donnell's statement was not necessarily incorrect but the description provided by Campbell was limited. These concerns amount to minor inconsistencies, and the judge was free to take note of the inconsistencies and resolve or discount them accordingly.

{¶ 71} As to McGee's testimony, Hatcher argues that McGee was not a reliable witness because he received a plea deal in exchange for testifying against

Hatcher. The trial court had sufficient information to judge the credibility of McGee. McGee explained to the court that he pled guilty to charges in two pending criminal cases and agreed to testify against Hatcher and a second defendant in another case. McGee further explained that because of his plea agreement, he was convicted of lesser felonies and was subject to a lesser sentence.

{¶ 72} The trial court, as the trier of fact, was in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining a witness's credibility. *State v. Clark*, 2010-Ohio-4354, ¶ 17 (8th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 66 (1964). The trial court made the following statement when it rendered the verdict:

> The Court has also considered the credibility of witnesses. I have applied the tests of truthfulness that I apply in my daily life. These tests include the appearance of each witness upon the stand. His or her manner of testifying. The reasonableness of the testimony. The opportunity he or she had to see, hear, and know the things concerning which he or she testifies. His or her accuracy of memory. Frankness, or lack of it. Intelligence, interest, and bias, if any, together with all the facts and circumstances surrounding their testimony. Applying these tests I have applied the weight to each witness's testimony as I found proper.
>
> This Court found the testimony of the State's witnesses to be credible and worthy of belief.

Tr. 314-315. The trial court had sufficient information to judge each witness's credibility and "was free to believe all, part, or none of the testimony of each witness." *State v. Colvin*, 2005-Ohio-1448, ¶ 34 (10th Dist.); *State v. Smith*, 2010-Ohio-4006, ¶ 16 (8th Dist.).

{¶ 73} We acknowledge McGee's potential bias and motive to lie because of his plea agreement but the trier of fact was not required to disbelieve McGee's testimony simply because of his agreement with the State. *State v. Bender-Adams*, 2024-Ohio-4897, ¶ 110 (8th Dist.); *see State v. Brightwell*, 2019-Ohio-1009, ¶ 39, 42-44, 50 (10th Dist.) (Jury was not required to disbelieve witness's testimony against defendant because testimony was procured pursuant to a plea agreement that permitted witness to plead guilty to a lesser charge and avoid a lengthy prison term.); *State v. Person*, 2017-Ohio-2738, ¶ 51-54 (10th Dist.) (The testimony of three codefendants who took plea deals and that constituted the primary evidence against appellant does not render a conviction against the manifest weight of the evidence.). "A defendant is not entitled to reversal on manifest weight grounds simply because a witness may be 'biased,' may have been motivated by self-interest in testifying or may have previously lied." *Bender-Adams* at ¶ 109.

{¶ 74} We cannot say this is the exceptional case where the evidence weighs heavily against the convictions nor that the trial court clearly lost its way and created a manifest miscarriage of justice. Accordingly, Hatcher's convictions are not against the manifest weight of the evidence, and Hatcher's first assignment of error is overruled.

{¶ 75} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
WILLIAM A. KLATT, JUDGE*

EMANUELLA D. GROVES, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR

(*Sitting by assignment: William A. Klatt, J., retired, of the Tenth District Court of Appeals.)